[No. S123481. Apr. 24, 2006.]

MORNING STAR COMPANY, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, et al., Defendants and Respondents.

COUNSEL

Erik S. Jaffe; Richard Todd Luoma and Brian C. Leighton for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Taylor Carey, Acting Chief Assistant Attorney General, Timothy G. Laddish and David S. Chaney, Assistant Attorneys General, Lawrence K. Keethe, Amy J. Winn and Molly K. Mosley, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**MORENO, J.**—Pursuant to Health and Safety Code section 25205.6, subdivision (a),[1] each year the Department of Toxic Substances Control (Department) provides the State Board of Equalization with a list of business classification codes that identifies the "types of corporations that use, generate, store, or conduct activities in this state related to hazardous materials." If a corporation has 50 or more employees in this state and falls within one of the listed codes, it must pay an annual fee correlated to its employee head count. The fee, which ranges from the hundreds to the thousands of dollars, offsets expenses associated with the regulation and control of hazardous materials by the state.

The Department takes the view that corporations with 50 or more employees within California invariably "use, generate, store, or conduct activities in this state related to hazardous materials." (§ 25205.6, subd. (a).) The Department reasons that materials it regards as inherent in everyday business activity, such as fluorescent light bulbs, batteries, inks, correction fluid, and toner used in printers and facsimile machines, constitute "hazardous materials," and that all qualifying companies "use, generate, store, or conduct activities" related to these items. Thus, each year the schedule submitted by the Department has included the codes for all corporations, except for one type of nonprofit business that the law specifically exempts from the assessment.

---

[1] All subsequent statutory references are to the Health and Safety Code except as otherwise indicated.

This practice has meant that virtually all corporations with 50 or more employees in this state must pay the hazardous materials charge.

Plaintiff Morning Star Company (Morning Star) is a California corporation that offers labor services to companies involved in the tomato processing business. Morning Star believes that it should not have to pay the hazardous materials charge. The company acknowledges that it utilizes computers, printers, fluorescent lights, and other items that the Department classifies as (or regards as containing) "hazardous materials." But Morning Star asserts that the Legislature did not consider companies in the firm's position as "us[ing], generat[ing], stor[ing], or conduct[ing] activities . . . related to hazardous materials," and that the Department, therefore, has promulgated overly expansive lists of codes.

Consistent with this position, Morning Star paid its fees for the years 1993 to 1996 under protest, and sought a refund from the State Board of Equalization (Board). Morning Star instituted this action when the Board rejected its demand. Morning Star seeks a refund, injunctive relief preventing collection of the charge, and a declaration that the Department has promulgated a regulation that should have been adopted, if at all, only following rulemaking under the Administrative Procedure Act, Government Code section 11340 et seq. (the APA). Morning Star also argues that the hazardous materials fee subverts constitutional guarantees of due process and equal protection.

We conclude that the Department's view that all California corporations "use, generate, store, or conduct activities in this state related to hazardous materials," coupled with its submission of all nonexempt codes to the Board, constitutes a "regulation" under the APA. The Department's interpretation of "use, generate, store, or conduct activities in this state related to hazardous materials" (§ 25205.6, subd. (a)) is reasonable, but not plainly ineluctable, meaning that the Department cannot avail itself of the APA exception that applies if an agency's construction of a statute represents "the only legally tenable interpretation of a provision of law." (Gov. Code, § 11340.9, subd. (f).) Morning Star is therefore entitled to relief declaring the Department's regulation invalid and remanding this action for further proceedings consistent with this opinion, as detailed below. Our resolution of the APA issue makes it unnecessary to address at this time Morning Star's additional challenges to the fee scheme.

## I. Factual and Procedural Background

■ This case concerns an assessment on corporations enacted in 1989 as part of a comprehensive overhaul of state hazardous materials law. (See generally Stats. 1989, ch. 269, p. 1315.) Each year by November 1, the

Department must provide the Board with a schedule of business classification codes identifying "the types of corporations that use, generate, store, or conduct activities in this state related to hazardous materials." (§ 25205.6, subd. (a).)[2] If a company retains 50 or more employees in this state and the Department includes the code describing its line of business on this schedule, then that corporation must pay an assessment indexed to its employee head count. (§ 25205.6, subd. (b).) This money is deposited in the Toxic Substances Control Account maintained by the state, to be disbursed to various programs relating to the control of hazardous substances. (*Id.*, subd. (c); see also § 25173.6, subd. (b) [identifying the programs funded by the Toxic Substances Control Account].)

In each year at issue, the Department provided the Board with a schedule that included every two-digit SIC code, except for one code (88) that referred only to households and, following legislative action, one four-digit code expressly freed from the fee requirement.[3] The Department's actions followed from its conclusion that *all* corporations with 50 or more employees in this state "use, generate, store, or conduct activities in this state related to hazardous materials," or at least that, in its words (per its interrogatory responses produced during discovery below), it "cannot conceive of" a corporation that would not do so. The Department's reading of the statute and its submission of all nonexempt codes to the Board have meant that virtually all corporations with 50 or more employees in this state must pay the appropriate assessment, subject to a handful of more general exemptions from taxation. The Department acknowledges that it never has engaged in APA rulemaking in connection with its construction and application of section 25205.6.

Morning Star challenges the Department's actions, for it takes the position that it does not "use, generate, store, or conduct activities in this state related to hazardous materials."[4] Morning Star first presented this argument to the Board in 1995. In rejecting Morning Star's contentions, the Board's response

---

[2] For the years directly at issue in this case, the Department used the United States Department of Commerce's Census Bureau Standard Industrial Classification (SIC) coding system. The SIC system attempted to describe and categorize all contemporary businesses using two-, three-, and four-digit codes, with each additional digit more narrowly specifying a particular class of corporations. Two-digit codes are known as "major groups," three-digit codes as "industry groups," and four-digit codes as "industries." For example, major group 48 (Communications) consists of five industry groups. The third of these groups, industry group 483 (Radio and Television Broadcasting Stations), is divided into two industries: industry 4832 (Radio Broadcasting Stations) and industry 4833 (Television Broadcasting Stations).

[3] The exempt industry consists of nonprofit corporations primarily engaged in providing residential social and personal care for children, the aged, and the disabled (SIC code 8361). (§ 25205.6, subd. (g).)

[4] The Board has advised Morning Star that it likely fits within either industry 0761 (Farm Labor Contractors) or 0762 (Farm Management Services). The Department's construction of

quoted an earlier decision by its appeals review staff in another matter that had provided, " '[t]he [Department] takes the position that all businesses in this state use, generate, store, or conduct activities related to hazardous materials. The definition of hazardous materials is broad enough to include any materials [*sic*] commonly found in the workplace. These include ink, toner fluid, heavy metals on circuit boards inside computers, cleaning substances, and mercury and polychlorinated biphenyl's [*sic*] in fluorescent lights.' " The Board also advised Morning Star that the statutory scheme, under which the Department's schedule of codes dictates the types of businesses that must pay the fee, precluded the Board from predicating the charge on a specific company's use of hazardous materials. The Board stated, "the [D]epartment has identified all SIC codes except 88, private households, as being subject to the fee. It is immaterial [for purposes of imposing the fee] whether a corporation does in fact use, generate, store or conduct activities related to hazardous materials." In other words, even if Morning Star did not use, generate, store, or conduct activities related to hazardous materials itself, it still had to pay the hazardous materials fee if its SIC code had been included on the Department's annual schedule.

The Board's appeals section also rejected Morning Star's objections to the assessments that had been imposed upon the company. The May 20, 1997 decision and recommendation responding to this challenge backtracked somewhat from the Board's earlier analysis, calling it "unfortunate" if other materials had suggested that an individual company's relationship with "hazardous materials" was irrelevant in determining whether it had to pay the fee. The decision and recommendation stated, "We agree with petitioner that the instructions [on the materials] seem to indicate that [the Department] is disregarding the statute and replacing it with its own determination." But the decision nevertheless declined to recommend relief. The decision and recommendation observed that section 25205.6, subdivision (a) "gives [the Department] the authority to determine which SIC codes involve types of businesses which use, generate, store, or conduct activities related to hazardous materials. [¶] Further, technical expertise resides solely within [the Department]. The Board has no capability to determine the degree or nature of hazardous materials." The decision and recommendation thus deferred to the Department's conclusions: "[The Department] has made a very broad interpretation of Section 25205.6. It has concluded that all corporations utilize materials such as copy machines and fluorescent lights and, therefore, handle hazardous materials. Since petitioner is a corporation which has more than 50 employees, we recommend that the petition be denied."

---

the law, however, typically makes the proper classification of a corporation immaterial, and in general the Department has perceived no need to assign SIC codes to particular corporations.

In March 1998, Morning Star paid the Board its assessed fees for the years 1993 through 1996, totaling $4,761.92. Morning Star made this payment under protest and filed a claim for a refund. In its claim, Morning Star acknowledged that it used "pencils, pens, fax machines, copy machines, and other equipment that any small office would utilize in its daily course of business in receiving information, communicating information, and storing information." Morning Star nonetheless insisted that it did not "use, generate, store, or conduct activities in this state related to hazardous materials," as it construed section 25205.6, subdivision (a). Morning Star also argued that the Department had promulgated an invalid "underground regulation" by determining that all corporations with 50 or more employees in this state "use, generate, store, or conduct activities in this state related to hazardous materials," and promulgating annual schedules consistent with this conclusion, without first complying with the APA's notice and comment procedures. On June 17, 1998, the Board denied Morning Star's refund request, relying on the reasoning previously presented in the 1997 decision and recommendation.

Morning Star instituted this action against the Board and the Department (the agencies) on July 16, 1998. In its complaint, Morning Star asserted that imposition of the fee violated the APA and the equal protection and due process clauses of the federal and state Constitutions. Morning Star did not and does not dispute that it utilizes, inter alia, fluorescent lights, cathode ray tubes in computers and a television, computer printers containing powdered graphite, a refrigerator containing refrigerants (chlorofluorocarbons or CFC's), thermostat controllers containing mercury switches, a microwave, copier machines and facsimile machines containing toner, and liquid paper and liquid paper correction pens, all of which were spotted during an inspection of Morning Star's offices. Morning Star nevertheless argues that these items are not "hazardous materials" and that the firm is not "us[ing], generat[ing], stor[ing], or conduct[ing] activities in this state related to" these items within the meaning afforded to these terms by section 25205.6, subdivision (a).

The superior court ultimately granted summary judgment in the agencies' favor. With respect to Morning Star's APA claim, the superior court determined that "[t]he statute here being applied specifies a procedure for the [Department] to follow on an annual basis; it does not contemplate the propriety or necessity of agency rule-making." When Morning Star appealed, the Court of Appeal affirmed. The Court of Appeal reasoned that "[t]he APA does not apply to the *enforcement* of an *existing* statute or regulation, regardless that it involves an interpretation, unless the means of enforcement [are] set out by an agency in a new rule of general application." In the case before it, the Court of Appeal determined, "In carrying out the mandate of section 25205.6 in sending the SIC codes to the [Board], the [Department] did no more than apply the section to carry out its obligation under the statute. Its action was specific to the task imposed. Although the [Department's]

determination to send the [Board] all, instead of some, of the SIC codes rests on the view that hazardous material includes common substances such as computer monitors and fluorescent light bulbs, it did not adopt a written policy that set forth that interpretation. In applying the definition the [Department] assumed that business enterprises in all of the applicable SIC codes in fact used such substances, an assumption which is fully supported by this record."

In dictum, the Court of Appeal posited that even had it agreed with Morning Star that the Department should have followed APA procedures, it still would not have granted the company's request for a refund. Citing to our decision in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater*), the Court of Appeal stated that if an invalid "regulation has been correctly applied in an adjudicative proceeding, the application remains valid notwithstanding that the regulation was not promulgated as required by the APA. [Citation.] Accordingly, Morning Star is not entitled to a refund of the fees it paid no matter what the outcome of the APA claim." The Court of Appeal also rejected Morning Star's constitutional challenges, concluding that the hazardous materials assessment represents a valid exercise of the Legislature's taxing authority.

We granted review to decide the following issues: (1) Whether the Department's inclusion of all SIC codes in the schedules it forwards to the Board constitutes a "regulation" subject to the APA; (2) whether the charge assessed under section 25205.6 represents a regulatory fee or a tax; and (3) whether imposing the fee only on corporations with 50 employees or more violates Morning Star's rights to substantive due process and equal protection under the state and federal Constitutions.

## II. DISCUSSION

As stated above, the Department has concluded that all corporations with 50 or more employees in this state "use, generate, store, or conduct activities in this state related to hazardous materials," making all nonexempt businesses subject to the hazardous materials fee. We first address whether, in so determining, the Department has promulgated a regulation subject to the rulemaking provisions of the APA.

The APA subjects proposed agency regulations to certain procedural requirements as a condition to their becoming effective. Pursuant to the APA, "[n]o state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in Section 11342.600, unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State . . . ." (Gov. Code, § 11340.5, subd. (a).)

■ "If a rule constitutes a 'regulation' within the meaning of the APA (other than an 'emergency regulation,' which may not remain in effect more than 120 days) it may not be adopted, amended, or repealed except in conformity with 'basic minimum procedural requirements' (Gov. Code, § 11346, subd. (a)) that are exacting. The agency must give the public notice of its proposed regulatory action (*id.*, §§ 11346.4, 11346.5); issue a complete text of the proposed regulation with a statement of the reasons for it (*id.*, § 11346.2, subds. (a), (b)); give interested parties an opportunity to comment on the proposed regulation (*id.*, § 11346.8); respond in writing to public comments (*id.*, §§ 11346.8, subd. (a), 11346.9); and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law (*id.*, § 11347.3, subd. (b)), which reviews the regulation for consistency with the law, clarity, and necessity. (*Id.*, §§ 11349.1, 11349.3.) Any regulation or order of repeal that substantially fails to comply with these requirements may be judicially declared invalid. (*Id.*, § 11350.)" (*California Advocates for Nursing Home Reform v. Bonta´* (2003) 106 Cal.App.4th 498, 507 [130 Cal.Rptr.2d 823], fn. omitted.) The procedural requirements of the APA "shall not be superseded or modified by any subsequent legislation except to the extent that the legislation shall do so expressly." (Gov. Code, § 11346, subd. (a); see also *Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 909 [54 Cal.Rptr.2d 225]; *State Water Resources Control Bd. v. Office of Admin. Law* (1993) 12 Cal.App.4th 697, 703–704 [16 Cal.Rptr.2d 25].)

These requirements promote the APA's goals of bureaucratic responsiveness and public engagement in agency rulemaking. "One purpose of the APA is to ensure that those persons or entities whom a regulation will affect have a voice in its creation [citation], as well as notice of the law's requirements so that they can conform their conduct accordingly [citation]. The Legislature wisely perceived that the party subject to regulation is often in the best position, and has the greatest incentive, to inform the agency about possible unintended consequences of a proposed regulation. Moreover, public participation in the regulatory process directs the attention of agency policymakers to the public they serve, thus providing some security against bureaucratic tyranny. [Citation.]" (*Tidewater, supra*, 14 Cal.4th at pp. 568–569.)

■ The aforementioned procedural requirements apply to agency "regulations." As used in the APA, " '[r]egulation' means every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (Gov. Code, § 11342.600.) "A regulation subject to the APA . . . has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided.

[Citation.] Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' [Citation.]" (*Tidewater, supra,* 14 Cal.4th at p. 571.)

We conclude that the Department's actions—specifically, determining that all corporations with 50 or more employees in this state "use, generate, store, or conduct activities in this state related to hazardous materials," and submitting all nonexempt SIC codes to the Board—amount to a "regulation" under the APA. The Department's actions apply "generally, rather than in a specific case" (*Tidewater, supra,* 14 Cal.4th at p. 571), because the Department's construction and application of the law mean that all nonexempt businesses are subject to the hazardous waste fee. The very limited review undertaken by the Board in disputes involving the hazardous materials charge demonstrates how the Department's actions have determined "how a certain class of cases will be decided." (*Ibid.*) In entertaining a claim that the hazardous materials fee should not apply to a particular entity, the Board looks only to whether the claimant (1) is a corporation; (2) has 50 or more employees; and (3) is not statutorily exempt. Any argument a corporation may have regarding its peculiar use or disuse of "hazardous materials" is regarded as beside the point, with the Department's determination that *all* corporations "use, generate, store, or conduct activities in this state related to hazardous materials" being treated as conclusive and binding.

The Department's actions also embody the second characteristic of a regulation for, as noted above, "regulations" include agency "interpretations" of the law. (See Gov. Code, § 11342.600.) The Department's conclusions "interpret . . . the law enforced or administered by [the agencies]" (*ibid.*) by deciding what items and substances constitute "hazardous materials" and specifying what it means to "use, generate, store, or conduct activities in this state related to" these materials. The Department has determined, first, that the term "hazardous materials" encompasses common items such as correction fluid, toner, certain types of pens and pencils, fluorescent lights, and materials used in computers and telephones; and second, that all corporations with 50 or more employees in this state "use, generate, store, or conduct activities . . . related to" these materials. As both indicia of a regulation exist, the Department should have complied with the APA, unless an exception applies.

Our decision in *Tidewater, supra,* 14 Cal.4th 557, further confirms that the Department has promulgated a regulation here. In *Tidewater,* the Division of Labor Standards Enforcement (DLSE) adopted a written policy providing that previously announced Industrial Welfare Commission (IWC) standards pertained to certain types of nautical crews. (*Id.* at p. 562.) The DLSE devised this policy without public input. (*Ibid.*) The policy was challenged on the ground that the DLSE's failure to comply with APA procedures in

promulgating the policy rendered it invalid. (*Id.* at p. 563.) We agreed that the policy constituted a "regulation" under the APA, and that the DLSE's failure to partake in APA rulemaking invalidated the rule. (*Id.* at p. 572.) After reciting the applicable law, we determined, "The policy at issue in this case was expressly intended as a rule of general application to guide deputy labor commissioners on the applicability of IWC wage orders to a particular type of employment. In addition, the policy interprets the law that the DLSE enforces by determining the scope of the IWC wage orders. Finally, the record does not establish that the policy was, either in form or substance, merely a restatement or summary of how the DLSE had applied the IWC wage orders in the past. Accordingly, the DLSE's enforcement policy appears to be a regulation within the meaning of Government Code section 11342, subdivision (g) [the predecessor of § 11342.600], and therefore void because the DLSE failed to follow APA procedures." (*Ibid.*)

■ Similarly here, the Department's interpretation of the relevant statutes and its decision to forward to the Board schedules containing all nonexempt codes have produced a "rule of general application" that "interprets the law." (*Tidewater, supra,* 14 Cal.4th at p. 572.) There has been no showing that the Department's actions were "merely a restatement or summary" of prior precedential decisions. (*Ibid.*) The Department has produced a regulation, and the APA applies.

The superior court and Court of Appeal each relied on flawed reasoning in finding the APA inapplicable. The superior court observed that "[t]he statute here being applied specifies a procedure for the [Department] to follow on an annual basis; it does not contemplate the propriety or necessity of agency rule-making." But the fact that section 25205.6, subdivision (a) imposes an annual duty on the Department does not, by itself, necessarily remove the Department's actions from the APA's purview. As discussed above, absent an express exception, the APA applies to all generally applicable administrative interpretations of a statute. (Gov. Code, § 11346, subd. (a); *Tidewater, supra,* 14 Cal.4th at p. 571; *Voss v. Superior Court, supra,* 46 Cal.App.4th at p. 909.) We believe that to remove what would otherwise constitute a regulation from the APA's scope, the Legislature must speak more clearly than it has here.

Likewise, while the Court of Appeal concluded that "[t]he APA does not apply to the *enforcement* of an *existing* statute or regulation, regardless that it involves an interpretation, unless the means of enforcement [are] set out by an agency in a new rule of general application," here the Department *has* embraced a generally applicable interpretation of a statute. As discussed, the Department's view of what it means to "use, generate, store, or conduct activities in this state related to hazardous materials" has caused it to include all nonexempt corporate codes on the schedules it has provided to the Board.

This interpretation applies generally by providing the first and last word regarding whether any nonexempt corporation with 50 or more employees in this state must pay the hazardous materials fee. And although the Court of Appeal found it significant that the Department has not promulgated a *written* policy relating its interpretation of "use, generate, store, or conduct activities in this state related to hazardous materials," the record establishes that the Department's construction and application of section 25205.6 have been as fixed and far reaching as would be the case if a written policy had been issued. We decline to endorse an approach that would allow an agency to avoid APA requirements simply by driving its regulations further underground.

■ The agencies presently advance an argument somewhat different from those accepted by the superior court and the Court of Appeal. The agencies emphasize that the APA's procedural requirements do not apply where an agency's interpretation of a statute represents "the only legally tenable interpretation of a provision of law." (Gov. Code, § 11340.9, subd. (f).) This exception codifies the principle that "[i]f certain policies and procedures . . . are . . . 'essentially [] a reiteration of the extensive statutory scheme which the Legislature has established' . . . then there is obviously no duty . . . to enact regulations to cover such reiterations, since the sixth commandment of 'nonduplication' prescribes 'that a regulation does not serve the same purpose as a state . . . statute . . . .' [Citation.] But to the extent any of the contents of the [statement of policy or procedure] depart from, or embellish upon, express statutory authorization and language, the [agency] will need to promulgate regulations." (*Engelmann v. State Bd. of Education* (1991) 2 Cal.App.4th 47, 62 [3 Cal.Rptr.2d 264].) Here, the agencies argue, the statutory scheme compels the conclusion that all corporations with 50 or more employees in this state "use, generate, store, or conduct activities in this state related to hazardous materials," and neither the Department nor the Board may subvert the avowed will of the Legislature.

■ To evaluate this argument, we consider, as with conventional statutory interpretation, the language and purpose of the relevant statutes in order to discern the Legislature's intent. (See *People v. Lopez* (2003) 31 Cal.4th 1051, 1056 [6 Cal.Rptr.3d 432, 79 P.3d 548].) That said, whether the Department has adopted the sole "legally tenable" reading of the statutes represents a different question than whether its interpretation is ultimately correct. As the APA establishes that "interpretations" typically constitute regulations, it cannot be the case that *any* construction, if ultimately deemed meritorious after a close and searching review of the applicable statutes, falls within the exception provided for the sole "legally tenable" understanding of the law. Were this the case, the exception would swallow the rule. Rather, the exception for the lone "legally tenable" reading of the law applies only in situations where the law "can reasonably be read only one way" (1989 Off. Admin. Law, Determination No. 15, Cal. Reg. Notice Register 89, No. 44-Z, pp. 3122, 3124), such that the

agency's actions or decisions in applying the law are essentially rote, ministerial, or otherwise patently compelled by, or repetitive of, the statute's plain language. (See Cal. Law Revision Com. com., 32D West's Ann. Gov. Code (2005 ed.) foll. § 11340.9, p. 94; 1989 Off. Admin. Law, Determination No. 15, Cal. Reg. Notice Register 89, No. 44-Z, pp. 3124–3131 [reviewing an agency interpretation of the law for compliance with the APA and concluding that although the agency had a "well-supported" rationale for its view, it was not the only legally tenable interpretation of the pertinent statute].)

We conclude that the Department's construction of the law does not fall within the parameters of this exception. First and foremost, while the agencies' argument is predicated upon their view that the statutory scheme denies the Department any discretion in determining who "use[s], generate[s], store[s], or conduct[s] activities in this state related to hazardous materials," the law provides some indication that the enacting Legislature did not share this opinion. Had the Legislature wanted to strip the Department of any discretionary decisionmaking authority as to this subject, it could have simply said so, and said so simply. But instead, it adopted a detailed scheme whereby each year the Department must identify the types of corporations that "use, generate, store, or conduct activities in this state related to hazardous materials," with "hazardous materials" being defined by reference to a complicated array of statutes and regulations;[5] group the corporations by code; and then forward to the Board the code schedules it has compiled. That the Legislature opted for these more roundabout procedures suggests that it envisioned a possibility that some corporations might not have a sufficient connection to "hazardous materials" to subject them to the annual charge. For us to conclude that the Legislature took the categorical view that the agencies now ascribe to it, notwithstanding the involved procedures set forth in section 25205.6, subdivision (a), we would also have to conclude that, all things being equal, the Legislature prefers Rube Goldberg-style rigmarole over more simple

---

[5] Specifically, section 25205.6, subdivision (a) expressly incorporates the definition of "hazardous material" used in section 25501. Section 25501, subdivision (o) states, " 'Hazardous material' means any material that, because of its quantity, concentration, or physical or chemical characteristics, poses a significant present or potential hazard to human health and safety or to the environment if released into the workplace or the environment. 'Hazardous materials' include, but are not limited to, hazardous substances, hazardous waste, and any material that a handler or the administering agency has a reasonable basis for believing that it would be injurious to the health and safety of persons or harmful to the environment if released into the workplace or the environment." The terms "hazardous substance" and "hazardous waste," both subsumed within the definition of "hazardous materials," are themselves also defined within section 25501 (see § 25501, subds. (p), (q)); these definitions incorporate numerous schedules and descriptions of substances and items deemed hazardous in particular contexts or concentrations under state law, federal law, or both (ibid.). Several of these schedules and definitions, in turn, refer to other schedules and definitions found elsewhere in the law, and so forth.

approaches. There seems good reason to pause before embracing this view of the statute, and of the Legislature.

The agencies, however, insist that the relevant statutes define "hazardous materials" so broadly as to compel the conclusion that all nonexempt corporations must pay the fee. This argument implicates the thicket of cross-references that lends meaning to the term "hazardous materials." Ultimately, these references point toward a collection of definitions, criteria, and schedules that identify, as potentially hazardous in certain contexts or under particular conditions, substances such as arsenic, asbestos, hydrochloric acid, and strychnine, as well as alcoholic beverages, ammonia, aspirin, calcium, carbon dioxide, iron, potassium, progesterone, sodium, and testosterone, just to name a few of the materials listed. (See, e.g., 49 C.F.R. § 172.101 (2005) [listing hazardous materials for transportation purposes]; Cal. Code Regs., tit. 8, § 339 [listing hazardous materials in the workplace].) The agencies reason that every corporation with 50 or more employees in this state "uses," "generates," "stores," or "conducts activities related to" at least one of the items or substances named within this maze of statutes and regulations.

But again, this argument "embellish[es] upon[] express statutory authorization and language" (*Engelmann v. State Bd. of Education, supra,* 2 Cal.App.4th at p. 62), in at least two ways. First, as Morning Star suggests, the Legislature conceivably could have regarded "hazardous materials" as encompassing only material that "poses a significant present or potential hazard to human health and safety or to the environment if released into the workplace or the environment" (§ 25501, subd. (o))—language used to describe "hazardous materials" in the definition set forth at section 25501, subdivision (o)—with the various materials named or encompassed within the cross-referenced definitions, criteria and schedules only becoming "hazardous" when they satisfy this standard. Under this interpretation of "hazardous materials," the mere presence of an item or substance on one of the many cross-referenced lists or schedules would not, by itself, establish that the material is "hazardous" for purposes of assessing the fee. Rather, to satisfy this standard the material would have to pose a "significant" hazard, with the term "significant" being sufficiently ambiguous to allow for at least some agency discretion in interpreting it. Morning Star's interpretation of the statute may be correct, or it may not be, but it is not palpably unreasonable. Second, and more fundamentally, the complicated tasks of tracing each of the "hazardous materials" cross-references; scanning and scrutinizing the referenced definitions, criteria, and schedules to determine whether they include or describe items used in everyday business; and then determining (or assuming) that these items are used by all California companies, or relate to their business affairs, hardly represents the sort of rote or ministerial application of

a statute that we believe the Legislature had in mind when enacting an APA exception for the sole "legally tenable" interpretation of the law.[6]

Next, the agencies argue that legislative materials pertaining to section 25205.6, or to hazardous materials generally, support their position that the Department has adopted the only "legally tenable" interpretation of the law. (E.g., Sen. Com. on Environmental Quality, Analysis of Sen. Bill No. 660 (1997–1998 Reg. Sess.) Sept. 15, 1997, p. 3 [referring to the assessment as "the broadbased fee levied on all corporations"]; Sen. Com. on Appropriations, Rep. on Assem. Bill No. 3540 (1993–1994 Reg. Sess.) Aug. 15, 1994, p. 1 [observing that "virtually all corporations, in some way, contribute to the generation of hazardous materials and hazardous waste"]; Assem. Com. on Environmental Safety and Toxic Materials, Analysis of Sen. Bill No. 475 (1989–1990 Reg. Sess.) July 11, 1989, p. 5 [noting that the assessment was intended to " 'broaden[] the base' " of funding for the state's hazardous materials program].) While potentially useful in ascertaining legislative intent, these materials simply do not categorically rule out alternative interpretations of the pertinent law.

The agencies also stress that, as originally enacted (see Stats. 1989, ch. 269, § 16, p. 1324), section 25205.6, subdivision (a) required the Department to use two-digit "major group" codes in composing its schedules, which the Department characterizes as being too broad to allow for meaningful distinctions among different types of corporations.[7] But the Legislature has since amended section 25205.6, subdivision (a), so that the Department now has greater flexibility in this regard, with the Department being permitted to use two-, three-, or four-digit SIC codes in compiling its schedules (see Stats. 1998, ch. 882, § 7),[8] and in any case classifications based on "major group" codes are possible, though less precise.

---

[6] Moreover, while we do not regard such exhaustive review as necessarily being appropriate in determining whether an agency has adopted the lone "legally tenable" interpretation of a statute, we have tracked each of the cross-references to which the agencies have directed us, in search of clear and conclusive proof that the scheme binds their hands and bars the exercise of discretion. Suffice it to say that as to each "hazardous materials" referent, a fair argument may be made that the cross-referenced schedule, criteria, or definition does not plainly compel the conclusion that all corporations with 50 or more employees in this state "use, generate, store, or conduct activities in this state related to hazardous materials" (§ 25205.6, subd. (a)), at least without interpretive deductions, or intuitive leaps and assumptions, that themselves "embellish upon" the statutory language. (*Engelmann v. State Bd. of Education, supra,* 2 Cal.App.4th at p. 62.)

[7] As an example, the Department notes that SIC Code 73 (Business Services) includes both Secretarial and Court Reporting Services (SIC code 7338) and Disinfecting and Pest Control Services (SIC code 7342).

[8] Also, pursuant to this amendment the Department may use the Department of Commerce's Census Bureau North American Industry Classification System (NAICS), instead of SIC codes. (See § 25205.6, subd. (a)(2).)

To repeat, the issue before us is whether the Department has adopted the only "legally tenable" interpretation of the law, *not* whether its interpretation is or is not consistent with the law. The former inquiry is significantly more circumscribed than the latter. For now, while the agencies' arguments suggest a basis for the Department's conclusion that all corporations with 50 or more employees in this state "use, generate, store, or conduct activities in this state related to hazardous materials" under section 25205.6, subdivision (a), the agencies have not established that this interpretation follows directly and inescapably from the pertinent provisions of law. This being the case, the agencies cannot avail themselves of the exception set forth at Government Code section 11340.9, subdivision (f), and the Department's regulation is therefore invalid. (*Id.,* § 11350, subd. (a).)

We now decide the appropriate remedy. Here, the agencies take the position that regardless of whether the Department has adopted the only "legally tenable" interpretation of the law, the agencies' understanding and application of its provisions are ultimately correct, and we should uphold the Board's refund rejection on this basis regardless of whether the Department has promulgated an invalid regulation. In effect, the agencies urge us to interpret and apply the statutory language "use, generate, store, or conduct activities in this state related to hazardous materials" ourselves, without deferring to the Department's interpretation (see *Tidewater, supra,* 14 Cal.4th at pp. 577–579 [affording invalid agency regulation no deference]; *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 205 [149 Cal.Rptr. 1, 583 P.2d 744] [same]), confident that we will arrive at the same conclusions that they have reached.

In so suggesting, the agencies invoke our decision in *Tidewater, supra,* 14 Cal.4th 557. In *Tidewater,* after finding the DLSE's policy void for noncompliance with the APA (*id.* at p. 572), we interpreted the underlying IWC wage order ourselves, without deference to the DLSE's policy, and found that it applied to plaintiffs (*id.* at pp. 577–579). In deciding to interpret and apply the order ourselves, we stated, "If, when we agreed with an agency's application of a controlling law, we nevertheless rejected that application simply because the agency failed to comply with the APA, then we would undermine the legal force of the controlling law. Under such a rule, an agency could effectively repeal a controlling law simply by reiterating all its substantive provisions in improperly adopted regulations." (*Id.* at p. 577.) We further observed that "[t]he DLSE's policy may be void, but the underlying wage orders are *not* void. Courts must enforce those wage orders just as they would if the DLSE had never adopted its policy." (*Ibid.*)

Important differences distinguish this case from *Tidewater.* The invalid regulation in *Tidewater* was a simple interpretive policy. This court was in as

good a position as the DLSE, or almost so, to interpret the underlying IWC wage order. The same is not true here; the statutory scheme before us calls for the application of administrative expertise in the first instance. For example, while the agencies urge us to uphold the charge levied on Morning Star by identifying as "hazardous materials" items the firm concedes it utilizes, it is unclear whether that would be the proper way to proceed under section 25205.6, for it may be the case that the practices of *other* types of businesses in Morning Star's SIC code—whichever two-, three-, or four-digit code that may be—are more relevant for purposes of deciding whether to include that code on the Department's schedule. As the record provides little to no indication what these other businesses are, let alone their potential connection to "hazardous materials," we are in no position to rule upon Morning Star's specific case. Likewise, many of the criteria and definitions through which the instant statutory scheme lends meaning to the term "hazardous materials" rely upon empirical tests or assumptions of fact in determining the hazard created by a particular item or substance.[9] The Department, and not this court, is in the best position to determine whether and in what circumstances given materials satisfy these standards. To transfer to the courts what are properly agency responsibilities as to these and similar matters would frustrate the intent of the Legislature in enacting the APA. We therefore decline to interpret and apply the hazardous materials law ourselves at this juncture.

Instead, we direct the Board to conduct further administrative proceedings on Morning Star's refund request, without reliance upon the Department's invalid regulation. (Cf. Cal. Law Revision Com. com., 32D West's Ann. Gov. Code, *supra*, foll. § 11425.50, pp. 299–300.) To avoid significant disruption of the fee scheme, however, upon remand the superior court shall issue an order staying these proceedings before the Board and otherwise maintaining the fee system as presently interpreted and implemented by the agencies, an order to remain in effect until such time as the Department has had a reasonable opportunity to promulgate valid regulations under the APA.

Our instructions here derive from the court's inherent power to issue orders preserving the status quo. (*California Hotel & Motel Assn. v. Industrial*

---

[9] For example, as previously detailed, "hazardous materials" include "hazardous waste," and the definition of "hazardous waste" found at section 25501, subdivision (q) incorporates the criteria of ignitability, corrosivity, reactivity, and toxicity set forth in Department regulations. (See §§ 25117, subd. (a), 25141; Cal. Code Regs., tit. 22, §§ 66261.20–66261.24.) The characteristic of ignitability is satisfied where a representative sample of a waste "is a liquid, other than an aqueous solution containing less than 24 percent alcohol by volume, and has a flash point less than 60 degrees C[elsius] (140 degrees F[ahrenheit]), as determined by a Pensky-Martens Closed Cup Tester, using the test method specified in ASTM Standard D-93-79 or D-93-80 . . . or a Setaflash Closed Cup Tester, using the test method specified in ASTM Standard D-3278-78 . . . or as determined by an equivalent test method approved by the Department . . . ." (Cal. Code Regs., tit. 22, § 66261.21, subd. (a)(1).)

*Welfare Com.* (1979) 25 Cal.3d 200, 216 [157 Cal.Rptr. 840, 599 P.2d 31].) In *California Hotel,* we concluded that a minimum wage order promulgated by the IWC pursuant to various sections of the Labor Code was invalid because it lacked an adequate "statement of basis" as required by statute. (*Ibid.*) But we further concluded that the order was of "critical importance to significant numbers of employees" who bore "no responsibility for the deficiencies of" the order. (*Ibid.*) We therefore exercised "our inherent power to make an order appropriate to preserve the status quo pending correction of deficiencies," directing the issuance of a writ of mandate to compel the IWC to correct the deficiencies "within 120 days of the finality of the opinion." (*Ibid.*)

So, too, in the present case, the continued viability of the hazardous materials fee program is of critical importance to the State of California, as determined by the Legislature, and any disruption in collection of the fee would seriously undermine the program. With these considerations in mind, as in *California Hotel* we will allow the Department a reasonable opportunity to correct the deficiency in its hazardous material fee regulations by subjecting them to APA procedures, while maintaining the current system in the interim. (Cf. *Sugar Cane Growers Co-op. of Florida v. Veneman* (2002) 351 U.S. App. D.C. 214 [289 F.3d 89, 97–98] [remanding agency action without vacating same where agency had failed to engage in the required notice and comment procedures]; *American Medical Assn. v. Reno* (1995) 313 U.S. App. D.C. 44 [57 F.3d 1129, 1135–1136] [remanding without vacating]; *International Union, UMW v. FMSHA* (1990) 287 U.S. App.D.C. 166 [920 F.2d 960, 967] [noting that decision to remand without vacating depends on "the seriousness of the order's deficiencies" and the "disruptive consequences of an interim change that may itself be changed"].) As determining the time necessary to come into APA compliance and what measures are necessary to maintain the status quo in the interim may require the consideration of facts not presently before us, we leave it to the superior court to determine the lifespan and precise terms of any such order. Once the Department has complied with the APA, Morning Star's administrative proceedings may resume, with these proceedings and the Department's schedules generally being governed by any properly adopted regulations.

Our disposition of the APA issue makes it unnecessary to address the second and third issues presented for review. Morning Star premises its arguments on these topics on what it regards as a simultaneously over- and under-inclusive fee scheme. As APA rulemaking may lead to changes in this system, addressing the firm's additional contentions on the merits at this time would cause us to issue a merely advisory opinion, which we decline to provide.

### III. Disposition

The judgment of the Court of Appeal is reversed, and this matter is remanded for additional proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.