54 Cal.Rptr.3d 443 (2007)
147 Cal.App.4th 680
Daniel A. CAPEN, Plaintiff and Respondent,
v.
Sandra SHEWRY, as Director, etc., et al., Defendants and Appellants.
No. C047172.
Court of Appeal of California, Third District.
February 8, 2007.
*445 Bill Lockyer, Attorney General, Thomas R. Yanger, Teresa Stinson, Assistant Attorney Generals, Frank S. Furtek, Margarita Altamirano, Supervising Deputy Attorney Generals, Roy S. Liebman, Deputy Attorney General, for Defendants and Appellants.
Greenberg Traurig, Livingston & Mattesich Law Corporation, Gene Livingston, Kathryn Doi, Daniel M. Fuchs, Sacramento, Terry German; Katten Muchin Rosenman, Katten Muchin Zavis Rosenman, Laurence G. Solov, Los Angeles, for Plaintiff and Respondent.
*444 BLEASE, Acting P.J.
The plaintiff, Dr. Daniel Capen, a licensed physician, is building a surgical clinic that he will wholly own and operate, in which non-owner, non-lessee, physicians will practice. He was informed by the Department of Health Services (Department) that a license for the clinic was required because it would be used by physicians who do not share in its ownership or operation in violation of Health and Safety Code section 1204, subdivision (b)(1), and does not come within the exemption of Health and Safety Code section 1206, subdivision (a).[1]
Section 1204, subdivision (b)(1) defines a surgical clinic subject to licensing as a "clinic that is not part of a hospital and that provides ambulatory surgical care for patients who remain less than 24 hours." It excludes from the definition a clinic "owned or leased and operated as a clinic or office by one or more physicians ... in individual or group practice..." Section 1206, subdivision (a) exempts from licensing a clinic "owned or leased and operated ... by one or more [physicians] and used as an office for the practice of their profession ..."
Dr. Capen brought this declaratory relief action claiming that sections 1204, subdivision *446 (b)(1) and 1206, subdivision (a) are ambiguous because they could be read either to exempt or not to exempt his clinic from licensing, and the Department's adverse interpretation constituted a regulation requiring compliance with the rulemaking procedures of the Administrative Procedures Act (APA). The trial court issued a declaratory judgment in favor of Dr. Capen.
The APA (Gov.Code, § 11340 et seq.), as pertinent here, defines a regulation subject to its rulemaking procedures as a standard of general application, within the quasi-legislative; authority of the agency, that interprets the law enforced. (Gov. Code, §§ 11342.600, 11346.) "[T]he APA establishes that `interpretations' typically constitute regulations...." (Morning Star Co. v. State Bd. of Equalization (2006) 38 Cal.4th 324, 336, 42 Cal.Rptr.3d 47, 132 P.3d 249 (Morning Star).) An agency interpretation of a governing statute is subject to the APA if it resolves an ambiguity of consequence to a claimed application. Conversely, an interpretation is not ambiguous if it is "the only legally tenable interpretation of a provision of law." (Gov. Code, § 11340.9, subd. (f).)
An interpretation that does not comply with the rulemaking procedures of the APA is void. (Armistead v. State Personnel Board (1978) 22 Cal.3d 198, 204, 149 Cal.Rptr. 1, 58:3 P.2d 744.) Nonetheless, a court may resolve the ambiguity if the interpretation is a matter of "simple interpretive policy" and may apply it in the case before it. (Tidewater Marine Western, Inc. v. Bradshaw (1996) 14 Cal.4th 557, 59 Cal.Rptr.2d 186, 927 P.2d 296 (Tidewater); Morning Star, supra, 38 Cal.4th at p. 340, 42 Cal.Rptr.3d 47, 132 P.3d 249.) That is the case here.
The claim of ambiguity in this case arises from the parsing of the modifiers in section 1204, subdivision (b)(1). Read symmetrically, the term "owned and operated by one physician" modifies "in individual practice" and the term "owned and operated by more than one physician" modifies "in group practice." An ambiguity arises only if the modifiers apply to both kinds of practice, that more than one owner physician could be said to be in individual practice, an internally contradictory reading, or that one owner physician could be said to be in a group practice. Only the latter reading tenders an ambiguity.
However, resolution of the ambiguity involves a "simple interpretive policy" implied from the grammar of the statute. We will conclude that if more than one physician owns and operates a clinic in a group practice, it is a partnership, requiring that each physician member of the group take responsibility for the operation of the clinic. The obvious policy is that each physician member of the group shall be responsible for the clinic's overall operation. It would violate that policy if one physician could own and operate a clinic in a group practice. On this view the symmetrical order of the language in section 1204, subdivision (b)(1), satisfies the policy and requires that Dr. Capen's proposed clinic be licensed.
We will reverse the judgment as applied to Dr. Capen and otherwise affirm the judgment voiding the Department's interpretive construction of the statute.

FACTS AND PROCEDURAL BACKGROUND
The complaint, filed September 18, 2002, alleges Capen is a licensed physician and "wants to open and operate a medical clinic where he and other physicians would practice but where he would be the sole owner." He seeks to come within the owner exception from the definition of a surgical clinic in section 1204, subdivision *447 (b)(1). In Capen's view, so long as "one or more" practitioners of a clinic are licensed and own or lease the clinic, and the clinic is "used as an office for the practice" of the profession shared by all the practitioners, the exemption is satisfied. He alleged the Department requires all physicians who practice at a clinic to have an ownership interest therein. He alleged that on August 2, 2002, the Department claimed "this interpretation has been standard policy since these sections of law were enacted in 1978."
The Department moved for summary judgment, claiming it did not tell Capen he could not operate a clinic in a certain way and no case or controversy existed. Capen moved for summary judgment, claiming the Department interpreted the exemption narrowly and he had standing to seek invalidation of an underground regulation.
In part the Department responded to Capen's motion by stating it "does not 'interpret' the statutes, but applies them as they are promulgated by the Legislature" or by using similar language. But the evidence and argument adduced on summary judgment shows the Department interprets the owner clinic exception to require every participating physician to have an ownership interest before a surgical clinic will be excluded from licensure. The Department submitted a declaration from a staff attorney asserting it applies "that understanding to individual factual situations as they are presented." The declaration does not deny that the Department applies this interpretation uniformly to all cases before it; it asserts that it is the only interpretation consistent with the statutory scheme.
The trial court denied the Department's motion and granted Capen's motion. The judgment provides that sections 1204 and 1206 "are ambiguous" and declares that the Department's "interpretation and/or enforcement ... requiring licensure for any clinic or office owned or leased by one or more licensed [physicians] and at which non-owner, non-lessee licensed [physicians] also practice is void" for lack of compliance with the APA. The trial court did not decide whether the Department's statutory interpretation was correct. The Department timely appealed.

I
The Administrative Procedure Act
The Department argues that its interpretations of sections 1204 and 1206 are correct and that this court is the ultimate arbiter of their meaning. It says that "[i]f the statutes in question are ambiguous, the court may look to extrinsic sources, including the ostensible objects to be achieved and the legislative history" and "select[ ] a construction that comports most closely with the apparent intent of the Legislature...."
However, resolution of the ambiguity must occur by application of the APA. It requires that the "exercise [by an administrative agency] of any quasi-legislative power conferred by any statute" must comply with the "minimum procedural requirements" set forth in the code. (Gov. Code, § 11346.) The procedural requirements apply to every regulation "within the scope of authority conferred" (Gov. Code, § 11342.1), including "every rule, regulation, order, or standard of general application ... adopted by any state agency to implement, interpret, or make specific the law enforced...." (Gov.Code, § 11342.600.)
A purpose of the procedure is "to assure that those persons or entities whom a regulation will affect have a voice in its creation [citation], as well as notice of the law's requirements...." (Tidewater, supra, *448 14 Cal.4th at; pp. 568-569, 59 Cal. Rptr.2d 186, 927 F.2d 296.) A failure to follow the required procedure voids the interpretation. (Id at pp. 576-577, 59 Cal. Rptr.2d 186, 927 F.2d 296; Armistead v. State Personnel Board, supra, 22 Cal.3d at p. 204, 149 Cal.Rptr. 1, 583 P.2d 744.)
"The APA is partly designed to eliminate the use of `underground' regulations; rules which only the government knows about. If a policy or procedure falls within the definition of a `regulation' within the meaning of the APA, the promulgating agency must comply with the procedures for formalizing such regulation, which include public notice and approval by the Office of Administrative Law (OAL). Failure to comply with the APA nullifies the rule." (Kings Rehabilitation Center, Inc. v. Premo (1999) 69 Cal. App.4th 215, 217, 81 Cal.Rptr.2d 406.) "To be deemed an underground regulation, the [policy] must meet two requirements: (1) the agency must intend it to apply generally rather than in a specific case; and (2) the agency must adopt it to implement, interpret, or make specific the law enforced by the agency." (Modesto City Schools v. Education Audits Appeal Panel (2004) 123 Cal.App.4th 1365, 1381, 20 Cal. Rptr.3d 831.)
In Tidewater the court ruled that the written interpretive policy of the Industrial Welfare Commission (IWC) that applied its wage orders to maritime employees working on oil-drilling platforms in the Santa Barbara Channel was void for failure to comply with the rulemaking procedures of the APA. The court said: "`[T]o give weight to [an improperly adopted regulation] in a controversy that pits [the agency] against an individual member of exactly that class the APA sought to protect ... would permit an agency to flout the APA by penalizing those who were entitled to notice and opportunity to be heard but received neither.'" (14 Cal.4th at p. 576, 59 Cal.Rptr.2d 186, 927 P.2d 296, quoting from Armistead v. State Personnel Board, supra, 22 Cal.3d at p. 204, 149 Cal.Rptr. 1, 583 P.2d 744.) Nonetheless, the court proceeded to interpret the regulation and affirmed the judgment of the court of appeal that the trial court erred in granting an injunction barring enforcement of the wage orders. It said: "although [it] determined not to give weight to [the] agency interpretation [it]. nevertheless considered whether that interpretation was correct." (14 Cal.4th at p. 577, 59 Cal.Rptr.2d 186, 927 P.2d 296.)[2]
In Morning Star, supra, 38 Cal.4th at page 340, 42 Cal.Rptr.3d 47, 132 P.3d 249, the court explained the result in Tidewater and the circumstances in which the court must both void the underground regulation and return it to the agency for its interpretation. Morning Star distinguished Tidewater on the ground it involved "a simple interpretive policy." (Ibid.) It said the court "was in as good a position as the [enforcing agency], or almost so, to interpret the underlying IWC wage order." (Id. at pp. 340-341, 42 Cal.Rptr.3d 47, 132 P.3d 249.) The simple interpretive policy involved a determination of the IWC's "territorial boundaries [as] relevant to determining whether IWC wage orders apply." (Tidewater, supra, 14 Cal.4th at p. 578, 59 Cal.Rptr.2d 186, 927 P.2d 296.) The court read the Labor Code as promoting the welfare of "`wage earners of California'" *449 and concluded that "the crew members who work ... in the Santa Barbara Channel reside in California, receive pay in California, and work in California" and "presumptively enjoy the protections of IWC wage orders" and therefore are within the territorial jurisdiction of the IWC. (Id. at pp. 578-579, 59 Cal.Rptr.2d 186, 927 P.2d 296.)
By contrast, the "statutory scheme [in Morning Star] call[ed] for the application of administrative expertise in the first instance." (Morning Star, supra, 38 Cal.4th at p. 341, 42 Cal.Rptr.3d 47,132 P.3d 249.) As applied to the hazardous materials statutes at issue, the court said the "Department [of Toxic Substances Control], and not [the] court, is in the best position to determine whether and in what circumstances given materials satisfy [the hazardous materials] standards." (Ibid.)
For these reasons the appellate remedy for a violation of the rulemaking procedures of the APA involving the resolution of a statutory ambiguity turns on the deference to be accorded the administrative agency. Where a statute has delegated authority to an administrative agency to apply its "administrative expertise in the first instance" in the interpretation of an ambiguous statute, the failure to follow the rulemaking procedures of the APA requires that the court both void the agency interpretation and return the case to the administrative agency to follow the APA, regardless whether the administrative interpretation is "ultimately correct." (Morning Star, supra, 38 Cal.4th at p. 336, 42 Cal.Rptr.3d 47,132 P.3d 249.)
An exception lies where there is "[one] legally tenable" reading of the statute of consequence to the action. (Gov.Code, § 11340.9, subd. (f); Morning Star, supra, 38 Cal.4th at p. 336, 42 Cal.Rptr.3d 47, 132 P.3d 249.) In such a circumstance there is no interpretive ambiguity to be resolved. The Supreme Court has given a broad reading to the term "interpretation." "As the APA establishes that `interpretations' typically constitute regulations, it cannot be the case that any construction, if ultimately deemed meritorious after a close and searching review of the applicable statutes, falls within the exception provided for the sole `legally tenable' understanding of the law.... Rather, the exception for the lone `legally tenable' reading of the law applies only in situations where the law `can reasonably be read only one way' [citation], such that the agency's actions or decisions in applying the law are essentially rote, ministerial, or otherwise patently compelled by, or repetitive of, the statute's plain language." (Morning Star, supra, 38 Cal.4th at pp. 336-337, 42 Cal.Rptr.3d 47, 132 P.3d 249.)
Applying this reasoning here, we find there is an interpretive ambiguity to be resolved because there is no one reading that is patently compelled by the statute.

II

Only Surgical Clinics Defined in Section 1204, Subdivision (b)(1) Are Subject to Licensure
"Except as provided in Section 1206, no person, firm, partnership, association, corporation, or public agency shall operate, establish, manage, conduct or maintain a clinic in this state without first obtaining a license therefor as provided in this chapter...." (§ 1205.) (Health & Saf.Code, div. 2, ch. 1, art. 1.) The chapter sets forth the requirements for obtaining a license and defines the clinics subject to licensing. Section 1204 specifies which clinics are "eligible for licensure" and includes "primary care clinics and specialty clinics." The specialty clinics "eligible for licensure" are defined in subdivision (b), and include surgical clinics.
*450 A surgical clinic "provides ambulatory surgical care for patients who remain less than 24 hours" and must be licensed by the Department. (§ 1204, subd. (b)(1).) The definition does not include a clinic "owned or leased and operated as a clinic or office by one or more physicians ... in individual or group practice " (Ibid.) Similarly, section 1206, subdivision (a) exempts from licensing a clinic "owned or leased and operated ... by one or more [physicians] and used as an office for the practice of their profession...."

III

Resolution of the Ambiguity in Section 1204, Subdivision (b) Involves a Simple Interpretive Policy
"An ambiguity arises when language is reasonably susceptible of more than one application to material facts." Dare v. Arnold Worldwide, Inc. (2006) 39 Cal.4th 384, 391, 46 Cal.Rptr.3d 668, 139 P.3d 56; quoting from California State Auto Assn. Inter-Ins. Bureau v. Superior Court (1986) 177 Cal.App.3d 855, 859, fn. 1, 223 Cal.Rptr. 246. Read one way the application favors the claimant, read the other way it does not. In this case the claimed ambiguity concerns the claim that Dr. Capen's surgical clinic is excluded from licensing.
The trial court reasoned that both sections 1204, subdivision (b)(1) and 1206, subdivision (a) could be read to exempt from licensing either a clinic wholly owned by one doctor but involving the practice of other doctors (Dr. Capen's case), or to include a clinic owned by more than one doctor in a group practice (the Department's claim), a manifest ambiguity of consequence to the action. With this much we agree. The question then is whether this court can resolve the ambiguity as one not requiring the application of administrative expertise.
The key is the definitional language of section 1204, subdivision (b)(1). It generally defines a surgical clinic subject to licensing as "a clinic that is not part of a hospital and that provides ambulatory surgical care for patients who remain less than 24 hours." This definition, without more, includes any surgical clinic no matter the nature of the ownership. However, subdivision (b)(1) excludes from the definition "any place or establishment owned or leased and operated as a clinic or office by one or more physicians or dentists in individual or group practice...."
The interpretation of this language does not require the application of administrative expertise. Section 1204, subdivision (b)(1) uses ordinary words"owned," "operated," "physician," "practice", that in context are easily accessible to understanding by a court. The language is best read symmetrically. The subdivision subjects to licensing a clinic owned and operated by one physician "in individual practice" or owned and operated by more than one physician "in group practice." An ambiguity arises only if the modifiers apply to both kinds of practice, that more than one owner physician could be said to be in individual practice, an internally contradictory reading, or that one owner physician could be said to be in a group practice. Only the latter reading tenders an ambiguity.
It would make no sense to refer to the ownership of a clinic by more than one physician in individual practice. It would make facial sense to refer to the ownership of a clinic by one physician in group practice if "group practice" means no more than that the physician who owns the clinic jointly practices with other physicians. But the phrase "the ownership and operation by more than one physician in group practice" essentially means a partnership. *451 (See Bus. & Prof.Code, § 2416; see also § 1212(a).) And this implies the "simple interpretive policy" that a partnership is required when ownership is by more than one physician so that each physician member in the group practice takes responsibility for the operation of the clinic. That rules out the ownership and operation by one physician.

IV

There is No Ambiguity in Section 1206 When Read Together With Section 1204, Subdivision (b)(1)
Dr. Capen argues that sections 1204, subdivision(b)(l) and 1206, subdivision (a) are ambiguous and that both can be read to exclude his surgical clinic from licensing. We have resolved any ambiguity in section 1204, subdivision (b)(1) in favor of the licensing of Dr. Capen's proposed clinic. That raises the question whether section 1206, subdivision (a) exempts from licensing a surgical clinic that otherwise is required to be licensed by section 1204, subdivision (b)(1).[3]
Section 1206, subdivision (a) exempts from licensure "any place or establishment owned or leased and operated ... by one or more licensed health care practitioners and used as an office for the practice of their profession, within the scope of their license...." (Italics added.) The sole burden of distinguishing between singular and multiple owned clinics lies with the word "their." That injects an ambiguity into the reading. It modifies the ownership clauses with respect to both singular and multiple ownership and could be read to serve the same function as the language in section 1204, subdivision (b)(1).
We read the language consistent with section 1204, subdivision (b)(1). It was added to the section in 1982 in the same enactment that added the phrase "owned or leased and operated as a clinic or office by one or more physicians" to the phrase "in individual or group practice" in section 1204, subdivision (b)(1). (Stats.1982, ch. 1306, §§ 2 and 3, pp. 4813-4814.) It would make no sense to say that the Legislature exempted single owner surgical clinics in group practice from licensing in section 1206, subdivision (a) at the same moment and on precisely the same grounds that it refused to exclude them from licensing in section 1204, subdivision (b)(1). It is thus apparent that the two sections are to be read together to require the licensing of single owner surgical clinics when in group practice.

DISPOSITION
The judgment is reversed as it applies to Dr. Capen. In all other respects the judgment voiding the Department's interpretive construction is affirmed. The parties shall recover their own costs on appeal. (Cal. Rules of Court, rule 8.276(3).)
BUTZ, J., concurs.
Dissenting opinion of MORRISON, J.
The majority opinion agrees with the trial court that there is more than one legally tenable way to interpret these statutes. I concur with this holding. The majority then concludes that interpreting *452 the language does not require the application of administrative expertise or consideration of comments from persons or entities affected by the interpretation or regulation. From this conclusion, I respectfully dissent.
While Morning Star Co. v. State Bd. of Equalization (2006) 38 Cal.4th 324, 340, 42 Cal.Rptr.3d 47,132: P.3d 249, and Tidewater Marine Western, Inc. v. Bradshaw (1996) 14 Cal.4th 557, 59 Cal.Rptr.2d 186, 927 P.2d 296 provide authority for us to interpret statutes without deference to agency expertise, this is not an appropriate case in which to do so. Although sections 1204, subdivision (b)(1) and 1206, subdivision (a) of the Health and Safety Code do not use technical terms, the regulation and licensing of the health care profession and health care facilities is technical and complex. During APA procedures a rulemaking file would be developed which would contain, among other things, a statement of reasons for the regulation, supporting data, and petitions from interested persons. (Gov.Code, § 11347.3.) These materials would indicate the degree to which the ultimate agency decision is or is not based on administrative expertise. Although the words of the two statutes briefed by the parties may seem to be words of common understanding requiring no deference to the agency, those statutes do not inform as to how clinic licensure fits within the entire health care regulatory scheme administered by the Department. That is why compliance with the APA will help ensure that the Department chooses the best interpretation, exercising its expertise in regulating the health care profession.
Further, the rulemaking file would also be used by the Office of Administrative Law (OAL)which has expertise in rulemaking-and "which reviews the regulation for compliance with law and other criteria and approves or disapproves the regulatory action." (Syngenta Crop Protection, Inc. v. Helliker (2006) 138 Cal.App.4th 1135, 1175-1176, 42 Cal.Rptr.3d 191; see, e.g., Mountain Lion Foundation v. Fish & Game Com. (1997) 16 Cal.4th 105, 133, 65 Cal.Rptr.2d 580, 939 P.2d 1280 [OAL rejected rule due to an inadequate statement of reasons]; Californians for Safe Prescriptions v. California State Bd. of Pharmacy (1993) 19 Cal.App.4th 1136, 1150-1153, 23 Cal.Rptr.2d 755 [statement of reasons in rulemaking file explained how regulation advanced statutory purpose].) The majority's decision bypasses both the Department's expertise in health care matters and the OAL's expertise in rulemaking.
NOTES
[1] A reference to a section is, to the Health and Safety Code unless otherwise designated.
[2] The resulting anomaly is that the agency must follow the rulemaking procedures of the APA, yet must comply with the court's interpretation, notwithstanding the policy of the APA that persons or entities whom a regulation will affect should have a meaningful voice in its enactment. Nonetheless, agency compliance with the APA will give notice to affected parties of the interpretation the agency will follow.
[3] The Department argues that its regulatory authority does not extend to section 1206 on the ground it does not apply to the "chapter," of which it is a part (Ch. 1 of Div. 2 of the Health & Saf.Code), and the grant of regulatory authority is found in section 1225, a part of the chapter. The argument would produce the curious result that the Department has rulemaking authority over inclusion within but not exemption from the licensing provisions. That is not a sensible reading. That the "chapter does not apply" simply means that it excludes clinics that are otherwise required to be licensed.