[No. C047172. Third Dist. Sept. 19, 2007.]

DANIEL A. CAPEN, Plaintiff and Respondent, v.
SANDRA SHEWRY, as Director, etc., et al., Defendants and Appellants.

COUNSEL

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Karen S. Schwartz, Thomas R. Yanger and Teresa Stinson, Assistant Attorneys General, Susan E. Slager, Frank S. Furtek, Margarita Altamirano and Roy S. Liebman, Deputy Attorneys General, for Defendants and Appellants.

Greenberg Traurig, Livingston & Mattesich Law Corporation, Gene Livingston, Kathryn Doi, Daniel M. Fuchs, Terry German; Katten Muchin Rosenman, Katten Muchin Zavis Rosenman and Laurence G. Solov for Plaintiff and Respondent.

Catherine I. Hanson for California Medical Association as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

**BLEASE, Acting P. J.**—Plaintiff, Dr. Daniel A. Capen, a licensed physician, is building a surgical clinic that he will wholly own and operate, in which nonowner, nonlessee physicians will practice. He was informed by the former state Department of Health Services (Department) that a license for the clinic was required because it would be used by physicians who do not share in its ownership and operation, in violation of Health and Safety Code section 1204, subdivision (b)(1).[1]

Section 1204, subdivision (b)(1), defines the surgical clinics subject to licensing by the Department. It includes any "clinic that is not part of a hospital and that provides ambulatory surgical care for patients who remain less than 24 hours," regardless who owns or operates the clinic. It excludes from the definition doctor-owned-and-operated clinics that are "owned or leased and operated as a clinic or office by one or more physicians . . . in individual or group practice . . . ." (*Ibid.*) The interpretation of the exclusion is the subject of this action.

Dr. Capen brought this declaratory relief action claiming that the exclusion[2] is ambiguous in that it could be read either to exempt or not to exempt

---

[1] A reference to a section is to the Health and Safety Code unless otherwise designated.

[2] Dr. Capen also challenges the Department's reading of the exemption from the definition of surgical clinic contained in section 1206, subdivision (a), but, as will be shown, our resolution of the meaning of section 1204, subdivision (b)(1), makes it unnecessary to consider the argument.

Section 1206, subdivision (a), in pertinent part exempts from the definition of section 1204, subdivision (b)(1), "any place or establishment owned or leased and operated as a clinic or

his clinic from licensing by the Department, and that the Department's adverse, generally applicable interpretation is a regulation requiring compliance with the rulemaking procedures of the administrative procedure act (APA) (Gov. Code, § 11340 et seq.). The trial court granted Dr. Capen's motion for summary judgment and issued a judgment in his favor voiding the interpretation.

"[A]bsent an express exception, the APA applies to all generally applicable administrative interpretations of a statute." (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 335 [42 Cal.Rptr.3d 47, 132 P.3d 249] (*Morning Star*).) There is an express exception for "the only legally tenable interpretation" (Gov. Code, § 11340.9, subd. (f)), but that is the case only if the administrative interpretation is "patently compelled by . . . the statute's plain language." (*Morning Star, supra,* at pp. 336–337.) An unwritten, generally applicable interpretation of an ambiguous statute "amount[s] to a 'regulation' " subject to the APA. (38 Cal.4th at p. 334.)

The question is whether the exclusion from the definition in section 1204, subdivision (b)(1), is ambiguous. It is not if read symmetrically; the phrase "owned . . . and operated . . . by one . . . physician[]" modifies "in individual . . . practice" and the phrase "owned . . . and operated . . . by . . . more [than one] physician[]" modifies "in . . . group practice." However, that reading is not "patently compelled" because one physician also could be said to be "in" a group practice if other physicians practiced in the clinic.

An ambiguous regulation that does not comply with the rulemaking procedures of the APA is void. (See *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 577–579 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater*).) Nonetheless, a court may resolve the ambiguity if its resolution involves a "simple interpretive policy," meaning a policy as to which the courts are "in as good a position as the [agency], or almost so, to [make the] interpret[ation] . . . ." (*Morning Star, supra,* 38 Cal.4th at pp. 340–341.)

In our initial opinion we concluded that such a policy could be inferred from the ordinary language and syntax of section 1204, subdivision (b)(1), that surgical clinics need not be licensed by the Department if all of the physicians practicing in the clinic had a share in its ownership and operation and accordingly had an economic and managerial interest in its safe operation, a policy which justified leaving such clinics unregulated.

---

office by one or more licensed [physicians] and used as an office for the practice of their profession, within the scope of their license . . . ."

We granted rehearing to consider the claim that we failed to consider that in 1994 the Legislature enacted legislation subjecting unlicensed surgical clinics to regulation by a division of the Medical Board of California (Medical Board), implying that surgical clinics owned and operated by physicians are to be regulated by the Medical Board and surgical clinics operated by others are to be regulated by the Department. (§§ 1248, 1248.1, subd. (c), 1248.15.) We agree.

The Department's regulatory authority over licensed surgical clinics extends to the establishment of minimum standards of safety for the surgical clinic facility and its equipment and to the setting of minimum standards of staffing. (§ 1226, subd. (a).) In 1994 the Legislature delegated authority to the Division of Licensing of the Medical Board to provide for the accreditation and setting of standards for unlicensed surgical clinics employing general anesthesia, including standards for the safety of the facility and its equipment and the adequacy and training of its personnel. (Stats. 1994, ch. 1276, § 2, p. 8187; § 1248.1, subd. (d).) It did so because it found "that in this state, significant surgeries are being performed in unregulated out-of-hospital settings." (Bus. & Prof. Code, § 2215.)

In this manner the Legislature divided the oversight of the safety of surgical clinics between two different agencies of government, primarily distinguished by the ownership and operation of the clinic by one or more physicians since that is the circumstance that excludes a clinic from licensing by the Department and thereby makes possible regulation by the Medical Board.

Under our previous reading of section 1204 the Department's licensing authority was dependent on whether the clinic was owned and operated by one, as distinguished from more than one physician, in group practice. However, it makes little policy sense to separate the regulation of physician-owned-and-operated clinics on that basis, given the Medical Board's general jurisdiction over the practice of physicians and specific jurisdiction over the safety of surgical clinics not licensed by the Department. The simple interpretive policy we derive is that physician-owned-and-operated surgical clinics are to be regulated by a division of the Medical Board and surgical clinics operated by nonphysicians are to be regulated by the Department, a determination involving the statutory allocation of responsibility that is not within the expertise of either agency.

Accordingly, we resolve the ambiguity in section 1204, subdivision (b)(1), by reading it to exclude physician-owned-and-operated surgical clinics from

licensing by the Department, leaving them, when using general anesthesia, to accreditation and regulation by the Medical Board.

For these reasons we shall affirm the judgment voiding the interpretive regulation of the Department.

## FACTS AND PROCEDURAL BACKGROUND

The complaint alleged that Capen is a licensed physician and "wants to open and operate a medical clinic where he and other physicians would practice but where he would be the sole owner." He contended that exclusion of physician-owned-and-operated surgical clinics from the definition of section 1204, subdivision (b)(1), permits him to wholly own or lease and operate a clinic at which nonowner, nonlessee physicians would also practice. (See also fn. 2, *ante*.)

Capen further alleged that the Department requires that all physicians who practice at a clinic have an ownership interest therein, that the Department says "this interpretation has been standard policy since these sections of law were enacted in 1978."

The Department moved for summary judgment, claiming it did not tell Capen he could not operate a clinic in a certain way and that no case or controversy existed. Capen moved for summary judgment, claiming the Department interpreted the exception narrowly and that he had standing to seek invalidation of an underground regulation.

In part the Department responded to Capen's motion by stating it "does not 'interpret' the statutes, but applies them as they are promulgated by the Legislature" or by using similar language. But the evidence and argument adduced on summary judgment shows the Department interprets the owner/clinic exception to require *every* participating physician to have an ownership interest before a surgical clinic will be exempted from licensure. The Department submitted a declaration from a staff attorney asserting it applies "that understanding to individual factual situations as they are presented." The declaration does not deny that the Department applies this interpretation uniformly to all cases before it; rather, it asserts that its interpretation is the only one consistent with the statutory scheme.

The trial court denied the Department's motion and granted Capen's motion. The judgment states that section 1204, subdivision (b)(1),[3] is ambiguous and declares that the Department's "interpretation and/or enforce-

---

[3] The judgment also includes the exemption in section 1206, subdivision (a). (For this, see fn. 2, *ante*.)

ment . . . requiring licensure for any clinic or office owned or leased by one or more licensed [physicians] and at which non-owner, non-lessee licensed [physicians] also practice is void" for lack of compliance with the APA procedures. The trial court did not decide whether the Department's statutory interpretation was correct.

The Department timely appealed.

## DISCUSSION

## I

## The Administrative Procedure Act

■ "If a policy or procedure falls within the definition of a 'regulation' within the meaning of the APA, the promulgating agency must comply with the procedures for formalizing such regulation, which include public notice and approval by the Office of Administrative Law (OAL)." (*Kings Rehabilitation Center, Inc. v. Premo* (1999) 69 Cal.App.4th 215, 217 [81 Cal.Rptr.2d 406].) The critical legal question here has to do with the meaning of the term "regulation."

■ The law of underground regulations, regulations that circumvent the rulemaking procedures of the APA, derives from *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198 [149 Cal.Rptr. 1, 583 P.2d 744] and is amplified in the *Tidewater* and *Morning Star* cases, by construction of the statutes which constitute the APA.

"The APA provides that '[n]o state agency shall issue, utilize, enforce, or attempt to enforce . . . a regulation' without complying with the APA's notice and comment provisions. (Gov. Code, § 11340.5, subd. (a) . . . .)" (*Tidewater, supra*, 14 Cal.4th at p. 570, italics omitted.) This provision "makes clear that the rulemaking procedures of the APA apply to any 'regulation,'" and "arguably" defines a regulation as including a "standard of general application [to interpret] the law . . . enforced," regardless that the interpretive regulation is not quasi-legislative. (*Id.* at pp. 575, 573.) That is so, reasons *Tidewater*, because "section 11340.5 makes clear that the rulemaking procedures of the APA apply to any 'regulation,' and the definition of regulation includes 'every rule . . . adopted . . . to . . . *interpret* . . . the law . . .' (i.e., interpretive regulations)." (*Id.* at p. 575.)

For these reasons the court in *Morning Star* said "the APA establishes that 'interpretations' typically constitute regulations" and that an unwritten policy, generally applied, "amount[s] to a 'regulation' . . . ." (*Morning Star, supra*, 38 Cal.4th at pp. 336, 334.)

■ *Tidewater* excluded from the APA procedures "interpretations that arise in the course of case-specific adjudication [because they] are not regulations, though they may be persuasive as precedents in similar subsequent cases." (*Tidewater, supra,* 14 Cal.4th at p. 571.) For this reason the answer to the question whether an interpretation constitutes a regulation depends upon the manner in which the issue arises. If the interpretation arises in the course of an enforcement proceeding involving the adjudication of a specific case it is not a regulation subject to the APA. If the interpretation arises from a challenge to the generally applied policy of the agency, as here, the resolution of the ambiguity in the circumstances tendered serves to define the meaning of the agency's general policy on that occasion and does constitute an interpretive regulation.[4]

■ This leads to the question what constitutes an interpretation subject to the rulemaking procedures of the APA. In general, an interpretation is required to resolve an ambiguity in the law to be enforced. " 'An ambiguity arises when language is reasonably susceptible of more than one application to material facts.' " (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 [46 Cal.Rptr.3d 668].) Read one way the application favors the claimant, read the other way it does not. Under the Supreme Court's view, an interpretation is ambiguous for purposes of the rulemaking procedures of the APA if no one reading of consequence to the action is "patently compelled . . . ." (*Morning Star, supra,* 38 Cal.4th at pp. 336–337.) The court reached this conclusion by contrast with its construction of the statutory exception from the APA for " 'the only legally tenable interpretation of a provision of law.' (Gov. Code, § 11340.9, subd. (f).)" (*Morning Star,* at p. 336.)

■ In distinguishing the court's ordinary authority to construe statutes, the *Morning Star* court said: "[W]hether the [agency] has adopted the sole 'legally tenable' reading of the statutes represents a different question than whether its interpretation is ultimately correct. As the APA establishes that 'interpretations' typically constitute regulations, it cannot be the case that *any*

---

[4] The meaning of language appears when it is applied. Language which has no application is senseless and language which applies in all circumstances is meaningless. Some applications are readily apparent from the language because the terms have a settled meaning in the circumstances considered. Where that is not the case, the application performs a different function. It "liquidates" or defines the correct meaning of the language in the circumstances of the application. This point was made long ago. "All new laws, though penned with the greatest technical skill, and passed on the fullest and most mature deliberation, are considered as more or less obscure and equivocal, until their meaning be liquidated and ascertained by a series of particular discussions and adjudications." (The Federalist No. 37, James Madison.)

construction, if ultimately deemed meritorious after a close and searching review of the applicable statutes, falls within the exception provided for the sole 'legally tenable' understanding of the law. Were this the case, the exception would swallow the rule." (*Morning Star, supra*, 38 Cal.4th at p. 336.) "Rather, the exception for the lone 'legally tenable' reading of the law applies only in situations where the law 'can reasonably be read only one way' [citation], such that the agency's actions or decisions in applying the law are essentially rote, ministerial, or otherwise patently compelled by, or repetitive of, the statute's plain language." (*Morning Star, supra*, 38 Cal.4th at pp. 336–337; see Gov. Code, § 11340.9, subd. (f).)

We next consider whether the Department's interpretation of section 1204, subdivision (b)(1) is a regulation subject to the APA.

II

The Department's Generally Applicable Interpretation of
Section 1204, Subdivision (b)(1), Is a Regulation Subject to
the APA

The Department has been granted authority to license and regulate surgical clinics, within the definition of section 1204, subdivision (b)(1), for the safety of the facility and its equipment, and to establish minimum staffing standards. (§§ 1204, subd. (b)(1), 1205, 1226, subd. (a).)

Section 1204, subdivision (b)(1), defines the clinics "eligible for licensure" and includes surgical clinics, generally defined as any clinic that "provides ambulatory surgical care for patients who remain less than 24 hours." At issue here is the meaning of the exception for a surgical clinic "owned or leased and operated as a clinic or office by one or more physicians . . . in individual or group practice . . . ." (*Ibid.*)[5]

The trial court reasoned that both section 1204, subdivision (b)(1), and section 1206, subdivision (a) (see fn. 2, *ante*), are ambiguous because they could be read to exempt from licensing either a clinic wholly owned and

---

[5] Section 1206, subdivision (a), further exempts from licensing a clinic "owned or leased and operated . . . by one or more licensed [physicians] and used as an office for the practice of their profession, within the scope of their license . . . ."

As noted in footnote 2, *ante*, our conclusion that section 1204, subdivision (b)(1), does not include Dr. Capen's clinic, rules out the possibility that section 1206, subdivision (a), excepts his clinic from that definition.

operated by one doctor but involving the practice of other doctors (Dr. Capen's case), or a clinic owned and operated by more than one doctor in a group practice (the Department's claim).

As noted, an ambiguity arises when a law may be read in more than one way of consequence to a claimed application. There is no ambiguity in section 1204, subdivision (b)(1), if read symmetrically: the phrase meaning "owned and operated by one physician" modifies "in individual . . . practice" and the phrase meaning "owned and operated by more than one physician" modifies "in . . . group practice." An ambiguity arises only if the modifiers apply to either one or both kinds of practice, such that multiple physicians could constitute an individual practice, an internally contradictory reading, or that one physician could be in a group practice. Only the latter reading tenders an ambiguity because it would make facial sense to refer to the ownership of a clinic by one physician "*in* . . . group practice" if "group practice" means no more than that the physician who owns and operates the clinic jointly practices with other physicians.[6] (Italics added.)

Accordingly, no one reading of section 1204, subdivision (b)(1), of consequence to this action, is "patently compelled." Because the Department's unwritten, contrary interpretation is a generally applicable policy, it "amounts" to a regulation subject to the rulemaking procedures of the APA. Since the Department did not comply with those procedures its interpretive regulation is void.

However, as noted in *Morning Star, supra,* 38 Cal.4th at page 336, the measure by which an ambiguity is measured for purposes of the rulemaking procedures of the APA is not the same measure by which the courts may resolve an ambiguity within their competence, i.e., whether the Department's interpretation is an interpretation to which the courts "must defer" in the first instance.

---

[6] The petitioners also claim that our initial opinion excluded professional corporations from the term "group practice" in section 1204, subdivision (b)(1). We agree that the term could include professional corporations. (See § 1212, which includes corporations along with partnerships among the entities that could apply for a clinic license.) However, that circumstance would not change the present analysis nor the grammar of section 1204, subdivision (b)(1)—the modifier—"more [than one] physician[]"—remains unchanged and conditions the term "group practice" as well.

## III

### The Court May Resolve an Ambiguity Underlying an Agency Interpretation to Which it Need Not Defer

In *Tidewater* the court ruled that the written interpretive policy of the Industrial Welfare Commission (IWC), that applied its wage orders to maritime employees working on oil-drilling platforms in the Santa Barbara Channel, was void for failure to comply with the rulemaking procedures of the APA. (*Tidewater, supra*, 14 Cal.4th at p. 576.)

Nonetheless, the court proceeded to interpret the regulation and affirmed that portion of the judgment of the Court of Appeal that the trial court erred in granting an injunction barring enforcement of wage orders issued by the IWC. The court said: "[A]lthough [it] determined not to give weight to an agency interpretation, [it] nevertheless considered whether that interpretation was correct." (*Tidewater, supra*, 14 Cal.4th at p. 577.)

*Tidewater* relied on *Armistead v. State Personnel Board, supra*, 22 Cal.3d 198, which invalidated a rule of the State Personnel Board that authorized an employee to withdraw a resignation he or she had tendered before its effective date, for failure to comply with the APA rulemaking procedures. The court then proceeded to interpret the applicable state statute as consistent with the board's interpretation.

As a consequence, since an administrative agency is mandated to follow the judicial interpretation of a statute, once that occurs there is no interpretive ambiguity for the agency to resolve and hence no interpretive regulation that it could enact. Nonetheless, *Armistead* concluded that "[f]or future cases the [State Personnel B]oard, if it so chose, could validate [its rule] by ensuring compliance with [the APA]." (*Armistead v. State Personnel Board, supra*, 22 Cal.3d at p. 201.)[7]

*Morning Star*, explained the result in *Tidewater* and the circumstances in which the court must both void the underground regulation and return it to the agency for its interpretation. (*Morning Star, supra*, 38 Cal.4th at p. 340.) It distinguished *Tidewater* on the ground that it involved "a simple interpretive policy," one that placed the court "in as good a position as the [agency],

---

[7] It is unclear what purpose compliance with the APA would fulfill. Since a purpose of the rulemaking procedures is to provide a hearing at which parties affected by a proposed rule could contribute to its formulation, there would be no point to such a hearing if nothing could come of it.

or almost so, to interpret the underlying IWC wage order." (*Id.* at pp. 340–341.) This formulation is the same as that generally applied by the courts in measuring the deference that a court must show an agency interpretation of the governing law. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031] [the deference that a court must show an agency interpretation of a statute turns on whether the agency has a " 'comparative interpretive advantage over the courts' " in interpreting the relevant statutes].)

The simple interpretive policy in *Tidewater* involved a question of jurisdiction, a determination that the IWC's "territorial boundaries are relevant to determining whether [the] IWC wage orders apply," a matter as to which the agency had not been delegated quasi-legislative authority. (*Tidewater, supra,* 14 Cal.4th at p. 578.) The court read the IWC's written policy as promoting the welfare of " 'wage earners of California' " and concluded that "the crew members who work . . . in the Santa Barbara Channel reside in California, receive pay in California, and work in California" and "presumptively enjoy the protections of IWC wage orders" and therefore are within the territorial jurisdiction of the IWC. (*Id.* at pp. 578–579.)

By contrast, the "statutory scheme [in *Morning Star*] call[ed] for the application of administrative expertise in the first instance." (*Morning Star, supra,* 38 Cal.4th at p. 341.) At issue was the statutory requirement that the Department of Toxic Substances Control supply the State Board of Equalization with a list of business classifications of corporations that use, generate, store, or conduct activities related to hazardous materials for the purpose of imposing a fee for the disposal of the substances.

*Morning Star* analyzed the court's interpretive power as a function of the court's deference to the administrative construction. It characterized the argument of the administrative agencies as "urg[ing] us to interpret and apply the statutory language 'use, generate, store, or conduct activities in this state related to hazardous materials' ourselves, without *deferring* to the Department's interpretation . . . ." (*Morning Star, supra,* 38 Cal.4th at p. 340, italics added.) As applied to the hazardous materials statutes at issue, the court said the "Department [of Toxic Substances Control], and not [the] court, is in the best position to determine whether and in what circumstances given materials satisfy [the hazardous materials] standards." (*Id.* at p. 341.)

■ By contrast, although the court must void an interpretive regulation that does not comply with the APA procedures, it may resolve the ambiguity that gave rise to the agency interpretation if it is not required to defer to the agency construction. (See *Armistead v. State Personnel Board, supra,* 22 Cal.3d 198, and *Tidewater, supra,* 14 Cal.4th 557.) In this regard the courts

generally distinguish between quasi-legislative rules, which involve the exercise of a delegated lawmaking power and come with a strong presumption of regularity, and an agency's interpretation of a statute, which is due a lesser degree of judicial deference. (*Yamaha Corp. of America v. State Bd. of Equalization, supra*, 19 Cal.4th at p. 11; *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1012–1013 [32 Cal.Rptr.3d 89, 116 P.3d 550].)

"Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation . . . that is the source of the presumptive value of the agency's views. An important corollary of agency interpretations, however, is their diminished power to bind. Because an interpretation is an agency's legal opinion, however 'expert,' rather than the exercise of a delegated legislative power *to make law*, it commands a commensurably lesser degree of judicial deference." (*Yamaha Corp. of America v. State Bd. of Equalization, supra*, 19 Cal.4th at p. 11, italics omitted.)

The California Supreme Court followed *Yamaha* in construing the provisions of the Knox-Keene Health Care Service Plan Act of 1975 (§ 1340 et seq.), which established the law relating to professional corporations, including medical corporations. It said: "[T]he issue here is the construction of statutes, and we generally 'are less inclined to defer to an agency's interpretation of a statute than to its interpretation of a self-promoted regulation. [Citation.]' [Citation.] Here, we have no reason to believe the [Department has] a ' "comparative interpretive advantage over the courts" ' in interpreting the relevant statutes. (*Yamaha* [*Corp. of America v. State Bd. of Equalization*], *supra*, 19 Cal.4th at p. 12.)" (*People v. Cole* (2006) 38 Cal.4th 964, 987 [44 Cal.Rptr.3d 261, 135 P.3d 669].)

In this case the Department has been granted authority to issue regulations "to carry out the purposes and intent of [the] chapter [which includes section 1204] and to enable the . . . department to exercise the powers and perform the duties conferred upon it . . . not inconsistent with any of the provisions of any statute . . . ." (§ 1225.) However, the substantive authority of the Department is defined in section 1226. It includes the regulation of the safety of a licensed clinic's facilities and equipment and the provision of minimum standards of staffing but does not extend to the definition of surgical clinic in section 1204, subdivision (b)(1).

In this case the interpretation of section 1204, subdivision (b)(1), does not require the application of administrative expertise. The dispositive words that modify "group practice" are ordinary words and the ambiguity arises from their syntactic arrangement. The issue is the jurisdictional extent of the Department's licensing power over surgical clinics, not the standards that apply once the clinic is licensed. (See § 1226.)

## IV

### The Ambiguity in Section 1204 Can Be Resolved by the Court

The question next tendered is whether, in the language of *Morning Star*, this court is "in as good a position as the [Department], or almost so, to interpret the underlying [statutes]" to resolve the grammatical issues in the interpretation of section 1204, subdivision (b)(1). (*Morning Star, supra*, 38 Cal.4th at pp. 340–341.)

We answer "yes" because the interpretation requires the allocation of responsibility for the oversight of surgical clinics between two agencies of government, a matter as to which neither agency has "administrative expertise in the first instance." (*Morning Star, supra*, 38 Cal.4th at p. 341.)

In our initial opinion we implied a "simple interpretive policy" to explain the syntactic arrangement of the terms of section 1204, subdivision (b)(1), such that a surgical clinic owned and operated by more than one physician in group practice is exempted from licensing on the view that each physician member in the group practice would take responsibility for the safety of the facility and its equipment and the adequacy of trained personnel to perform the services offered. That ruled out the ownership and operation of a clinic by one physician where other physicians practice but who do not share in its ownership and operation.

Dr. Capen, supported by the California Medical Association, submitted a petition for rehearing, claiming that "the policy underlying the Licensing Statutes is not to ensure that every licensed health care professional who practices at an exempt clinic is responsible for the clinic's overall operation, but rather to ensure that those who own and operate a clinic are licensed health care professionals, rather than lay persons."

The California Medical Association asserts inter alia that physician-owned surgical clinics are excluded from licensing under the clinic licensing law because "the Legislature [has] concluded that the corporate practice of medicine bar does not apply to prevent lawfully organized physician groups

from practicing medicine" (see Bus. & Prof. Code, §§ 2402, 2416), and that the 1994 legislation contained in section 1248 et seq. implies that the Legislature placed the regulation of surgical clinics operated by physicians under the Medical Board. We reach only the latter of these claims.

The Department replies that "[b]oth Plaintiff/Respondent and Amicus CMA gloss over the fact that the operation of a clinic entails more than just the practice of medicine. It involves hiring, firing, and training staff. It involves the purchase, maintenance and calibration of delicate equipment. It involves the securing and maintenance of a physical premises . . . ." (See § 1226.) That purpose is to regulate the "adequacy, safety, and sanitation of the physical plant and equipment[ and] minimum standards for staffing . . . ." (§ 1226, subd. (a); see also §§ 1226, subd. (b) [building safety standards], 1226.5 [seismic safety standards].)[8]

We would agree if this were the only legislative policy at issue because in general the Medical Board regulates the practice of medicine and the Department regulates the facilities in which the practice occurs. (36 Cal.Jur.3d (2007) Healing Arts and Institutions, § 61, p. 312.)

However, the California Medical Association points out that in 1994 the Legislature enacted a statute governing "outpatient settings," defined to include surgical clinics, impliedly recognizing that "physician practices, including those in corporate form, were not regulated pursuant to the clinic licensure laws . . . by requiring additional regulation for physician practices." (See §§ 1248–1248.85.) We agree.

The 1994 legislation was preceded by findings of necessity which are set forth in Business and Professions Code section 2215. They provide in pertinent part: "The Legislature finds and declares that in this state, significant surgeries are being performed in unregulated out-of-hospital settings. The Legislature further finds and declares that without appropriate oversight, some of these settings may be operating in a manner which is injurious to the public health, welfare, and safety. Although the health professionals delivering health care services in these settings are licensed, further quality assurance is needed to ensure that health care services are safely and effectively performed in these settings." (Stats. 1994, ch. 1276, § 1, p. 8186.)

---

[8] Section 1226, subdivision (a) provides in full: "The regulations shall prescribe the kinds of services which may be provided by clinics in each category of licensure and shall prescribe minimum standards of adequacy, safety, and sanitation of the physical plant and equipment, minimum standards for staffing with duly qualified personnel, and minimum standards for providing the services offered. These minimum standards shall be based on the type of facility, the needs of the patients served, and the types and levels of services provided."

The substantive statutes are set forth in the Health and Safety Code. Section 1248, subdivision (c), in pertinent part defines " '[o]utpatient setting' " to mean "any facility, clinic, unlicensed clinic, center, office or other setting that is not part of a general acute care facility . . . and where anesthesia, except local anesthesia or peripheral nerve blocks, or both, is used . . . ." Section 1248.1 prohibits any person or collective entity, to wit, any "association, corporation, firm[ or] partnership," from operating an outpatient setting unless it is a "surgical clinic licensed under subdivision (b) of Section 1204" (§ 1248.1, subd. (d)) or is "accredited by an accreditation agency approved by the [Division of Licensing of the Medical Board of California]" (*id.*, subd. (g)). Lastly, the Division of Medical Quality of the Medical Board is given authority to enjoin a violation of the licensing law (§ 1248.7) and a willful and knowing violation by a physician and surgeon constitutes unprofessional conduct (§ 1248.65).

The Division of Licensing of the Medical Board is required to adopt standards for accreditation which shall include licensed health care staff, "a system for facility safety," "onsite equipment, medication, and trained personnel to facilitate handling of services sought or provided" and "a written transfer agreement with a local accredited or licensed acute care hospital . . . ." (§ 1248.15, subd. (a)(2)(A), (B), (C)(i).) And both the Division of Licensing and the Division of Medical Quality are given authority to enforce the standards set by the licensing division. (§§ 1248.5, 1248.55, 1248.65, 1248.7.)

■ In this manner the Legislature has divided the responsibility for the oversight of the safety of surgical clinics between two different agencies of government, the Department and the Medical Board. This implies that the Legislature has distinguished between surgical clinics owned and operated by doctors, which are generally regulated by the Medical Board, and surgical clinics owned and operated by others, which are generally regulated by the Department. The simple interpretive policy we derive is that physician-owned-and-operated surgical clinics are to be regulated by a division of the Medical Board, when general anesthesia is used, and surgical clinics operated by nonphysicians are to be regulated by the Department, a determination that is not within the expertise of either one of the agencies, including the Department.

For these reasons Dr. Capen's clinic is not subject to licensing and regulation by the Department.

## DISPOSITION

For the reasons set forth above the judgment voiding the interpretive regulation of the Department is affirmed. Dr. Capen shall recover his costs on appeal. (Cal. Rules of Court, rule 8.276(a)(3).)

Morrison, J., and Butz, J., concurred.