Filed 4/9/13  P. v. Gomberg CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>DAVID GOMBERG,<br><br>        Defendant and Appellant. | H033519<br>(Santa Clara County<br>Super. Ct. No. 210942) |

A jury found David Gomberg to be a sexually violent predator (SVP).  On appeal from the resulting order of commitment, he raised numerous objections including that the trial court lacked fundamental jurisdiction and violated his due process rights because after the petition was filed, the matter was held in abeyance for nearly three years while he served a prison term in Oregon.  We initially rejected all of these contentions except for a challenge to the SVP statute on the ground that it violated various constitutional provisions.  As to that issue we directed a remand for further proceedings; however the California Supreme Court granted review and retransferred the matter to us with directions to abate the matter pending further proceedings on remand from *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee*).  That stay has now been lifted and we now reiterate our previous opinion on all issues save the last, as to which we follow the holding on remand in *McKee* that the SVP statute does not offend the equal protection

clause in any of the respects urged by defendant.  Accordingly, we will affirm the order of commitment.

## BACKGROUND

On January 6, 2005, the District Attorney of Santa Clara County (plaintiff) filed a petition to commit David Gomberg (defendant) under the SVP act, Welfare and Institutions Code sections 6600 et sequitur.[1]  The petition recited that defendant was an inmate of the Department of Corrections in Vacaville with a parole date of February 3, 2005.  The court ordered the warden in Vacaville to produce defendant for a hearing on January 19, 2005.  Five days before that date, the court ordered the warden to produce him on February 1.  On February 2, the matter was apparently continued to the next day.  On that day the clerk's minutes reflect "discussions . . . in chambers" and note that defendant was "in Solano Co[unty]."

Similar notations appear in the minutes until May 6, 2005, when defendant's attorney filed a motion to "strike the petition in its entirety on the grounds that the court lacks subject matter jurisdiction and personal jurisdiction."  The supporting memorandum stated that the January 19 hearing date had been "vacated by the court" and "reset" to February 2, on which date defendant was not transported to the hearing, "having instead been transported to the Superior Court in Solano County for extradition in Oregon" to serve a sentence previously imposed there.  Defendant arrived in Oregon, according to the memorandum, on February 3, which was his California release date.  He was scheduled to be released from his Oregon imprisonment between February 15 and November 2, 2008, and had a "felony detainer lodged against him (probably from California)."

---

[1] Except as otherwise noted, all further statutory citations are to the Welfare and Institutions Code.

The memorandum argued that the court lacked subject matter jurisdiction because defendant's Oregon incarceration put the relief sought—defendant's confinement in Atascadero State Hospital—beyond the court's power. It conceded that "the petition was properly filed, while Mr. Gomberg was still in California," that he "had the necessary minimum contacts with [California]," and was "provided with notice of the action, in that he has an attorney who has entered a general appearance and who has forwarded to him all the documents so far related to the case." It observed, however, that "he has had no opportunity to appear at a hearing," and that it "does not appear that the prosecution is going to bring him here." Moreover, it asserted, even if he were present, "the court would still lack the ability to order [him] into a hospital setting in California, because of the looming consecutive sentence previously imposed by Oregon." "He would have to be transported to Oregon to satisfy that sentence, as a criminal case takes precedence over a civil one."

Simultaneously with the motion to strike, defendant filed a "motion for probable cause hearing." He asserted that under the sexually violent predator statutes, he had "just as much right to demand that his petition be reviewed, and that the probable cause hearing be set right away, as do the People." He noted that this would require his transportation from Oregon, failing which "the petition should be dismissed."

In a reply memorandum, defendant's then-attorney stated that she was withdrawing the companion motion to strike the petition for want of jurisdiction, which she believed had been rendered "pointless" by a decision holding that "civil remedies like summary judgment don't apply to a special proceeding like a SVP case." (See *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1365-1366.) She noted, however, that the decision had relied on an earlier decision in which the refusal to permit the prisoner to raise a jurisdictional challenge by motion for summary judgment was justified in part on the premise that he could "raise the jurisdictional issue at his probable cause hearing." (*Bagration v. Superior Court* (2003) 110 Cal.App.4th 1677, 1688-1689.) To deny

3

defendant a probable cause hearing, counsel argued, was "to deny him the only forum at which he can argue with the court's jurisdiction."

On May 25, 2005, the court denied the motion to set a probable cause hearing.

At some point—apparently around early November, 2007—defendant was returned to the custody of California authorities. On November 2, the court granted plaintiff's motion to require defendant to submit to an interview for an updated evaluation as a sexually violent predator. About six weeks later the court commenced a probable cause hearing. Defendant filed a motion to dismiss on the grounds that the proceedings violated his rights to due process and a speedy trial. The court denied the motion. After taking evidence, the court found probable cause to order a trial to determine whether defendant should be confined under the SVP act.

On September 3—about a month before the date set for trial—defendant moved to dismiss the petition on the ground that it was "void for want of due process" because the screening evaluation required by statute to be conducted "in accordance with a standardized assessment protocol" (§ 6601, subd. (c)) had been conducted pursuant to "an invalid 'underground' regulation." The argument stemmed from the fact that the Department's handbook and standardized assessment protocol applicable to such evaluations had been found by the Office of Administrative Law (OLA) to constitute a "regulation" not adopted in conformity with the Administrative Procedures Act, and thus invalid. The court denied the motion.

After a trial the jury returned a verdict finding true the allegation that defendant was a sexually violent predator. The court ordered his commitment "until further order of this court." Defendant immediately appealed.

## DISCUSSION

### I. *Motion to Strike*

Defendant contends that he was denied the effective assistance of counsel when, in May 2005, his then-attorney withdrew a pending motion to strike (dismiss) the petition

4

on grounds of lack of jurisdiction. Respondent contends that (1) counsel's withdrawal of the motion did not constitute ineffective assistance because the motion "was not the appropriate vehicle to challenge the jurisdiction of the court"; and (2) the withdrawal was harmless because the court possessed jurisdiction and therefore could not have granted the motion in any event.

We are not persuaded that a motion to strike or dismiss a petition is an inappropriate "vehicle" for challenging the trial court's fundamental power to adjudicate a petition under the SVP act. The case counsel cited below for this proposition held that a motion for summary judgment would not lie in SVP proceedings. (*Bagration v. Superior Court*, *supra*, 110 Cal. App. 4th 1677, 1689.) The basis for that holding appears to be that the statute governing summary judgment contemplates a motion that can be made by "any party," but the state cannot properly seek summary judgment in an SVP proceeding because an order granting such a motion would offend provisions of the SVP requiring, for example, trial by jury. In that respect, and perhaps others, the summary judgment procedure as prescribed by statute was inconsistent with the SVP act and therefore unavailable in proceedings under it. This reasoning will not bear extension beyond its specific context to declare the entire Code of Civil Procedure inapplicable to SVP proceedings. Nor are we impressed by the fact that a defendant may raise jurisdictional objections at a probable cause hearing. (See *id.* at p. 1689.) If facts apparent on the face of the record or from judicially noticeable materials show a fundamental lack of power to adjudicate the matter, there is no apparent reason to require the defendant to await a probable cause hearing, particularly since he is presumably in state custody during that time, quite possibly—indeed probably—on the sole basis of the SVP petition.

We need not finally decide the question, however, for as will appear, defendant appears unable to establish the requisite prejudice resulting from counsel's assertedly deficient performance. Assuming the motion was a proper vehicle for the jurisdictional

5

challenge, and that counsel was mistaken in withdrawing it under a contrary belief, the mistake could only support relief on grounds of ineffective assistance if it was prejudicial. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) The withdrawal of a defense motion could not ordinarily be found to have prejudiced the defendant unless the trial court would have granted, or would have been obliged to grant, the motion. As will appear, defendant has failed to demonstrate that the court was under any such obligation here. For that reason, the claim of ineffective assistance fails.

## II. *Jurisdiction*

Defendant argues that his transfer to Oregon penal custody deprived the court of jurisdiction over this matter and required its dismissal. He cites *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288, for the proposition that a "[f]undamental lack of jurisdiction" appears when the forum court "is not able to render a judgment against the person." Likewise he cites *Corona Unified Hospital Dist. v. Superior Court* (1964) 61 Cal.2d 846, 852, for the proposition that a court lacks jurisdiction in the fundamental sense when it "lacks the power to protect the fundamental rights of a litigant," because "all jurisdiction must include the ability to *effectively* adjudicate the rights at issue." He asserts that because of his absence, the trial court could not honor his "right to be present and to assist counsel." Moreover, the court "lacked the physical ability to commit appellant" and could not cause him to be "treated by the Department of Mental Health" as contemplated by the SVP act. This inability to adjudicate the matter or grant relief, he contends, ousted the court of fundamental jurisdiction and left it no option but to dismiss the petition.

We accept the premise that the court could not adjudicate the petition while defendant was in Oregon. For one thing, he was surely entitled to personally attend and assist in his trial. (See §§ 6602, 6603 [SVP defendant's trial rights]; *People v. Concepcion* (2008) 45 Cal.4th 77, 81 [criminal defendant's right to personal presence at

6

trial]; *In re Watson* (1979) 91 Cal.App.3d 455, 460-461 [habeas issued based on denial of subject's due process right to be personally present at trial of petition for commitment as developmentally disabled person].) There is no indication that Oregon authorities could be prevailed upon to produce him for such a purpose, and even if it be assumed that they could, the SVP act contemplates an *immediate* commitment to the custody of the Department of Mental Health (§ 6604), and it is difficult to see how such an order could fail to conflict with Oregon's interest in the matter—or with the conditions on which Oregon authorities might have been willing to return him to California to participate in such a trial.

In the context of his due process argument, which we address in the next part, defendant suggests that California authorities were at fault for *surrendering* him to Oregon in the first place. But as noted below, we are reluctant to suppose that California officials were under a duty to defy the penal interests of a sister sovereign in order to preserve this state's jurisdiction over defendant. We are not called upon to consider, and make no attempt to decide, the lawfulness of the various "holds" to which defendant was apparently subjected or the principles that ought to govern their priority as between the two sovereigns. None of the facts surrounding those matters appear in the record, or are made the basis of any argument by defendant. For present purposes, then, we assume that defendant was lawfully and properly surrendered to Oregon authorities and that so long as he remained in their custody the court below could not adjudicate the matter on the merits.

But here we arrive at the critical point: the court below made *no attempt* to adjudicate the matter on the merits. Assuming its inability to do so can be properly characterized as a lack of jurisdiction, it did not seek to exercise that jurisdiction while the cause of the inability—defendant's absence from the state—existed. Defendant would apparently have us conclude that once the court found itself unable to adjudicate the petition forthwith, it was permanently and irremediably deprived of fundamental

7

jurisdiction. But he offers no authority for this view, and we see no basis for it in procedural theory. The situation appears analogous to those in which adjudication is impeded, but not absolutely barred, by some external cause. The most familiar such situation is where another action is already pending on the same cause of action asserted in the present matter or another court has assumed jurisdiction over the subject matter of the dispute. (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1138, p. 562; see Code Civ. Proc., § 430.10, subd. (c); *Levine v. Smith* (2006) 145 Cal.App.4th 1131, 1135.) Others include the plaintiff's lack of capacity to sue (5 Witkin, *supra*, Pleadings, § 1133, p. 559), a defect or misjoinder of parties (5 Witkin, §§ 1136, 1137, pp. 561-562), and various kinds of factual prematurity (5 Witkin, § 1153, p. 578). An analogy might also be drawn to the suspension of proceedings brought about by the automatic stay attendant on the filing of a bankruptcy petition (see *366-386 Geary St., L.P. v. Superior Court* (1990) 219 Cal.App.3d 1186, 1195, 1197) and to the contingent loss of jurisdiction when a state court action is removed to federal court (see 2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 652, p. 653).

In none of these situations is the affected action *dismissed* unless the defect appears irremediable. Rather the usual remedy is to "abate" the affected action until the impediment either lifts or ripens into an absolute bar. (See 5 Witkin, *supra*, Pleadings § 1149, p. 573; *Lord v. Garland* (1946) 27 Cal.2d 840, 851; *Childs v. Eltinge* (1973) 29 Cal.App.3d 843, 848, 855; cf. *Levine v. Smith*, *supra*, 145 Cal.App.4th at p. 1135 [rule of exclusive concurrent jurisdiction ceases to operate when jurisdiction in earlier matter exhausted].) It would seem, by analogy, that defendant's absence from the state should have generated a similar suspension of the proceeding—an abatement—pending his return to California custody. Since this is exactly what occurred—though not by this description—no basis for dismissal readily appears.

Moreover we question the premise that the facts shown here gave rise to any defect in jurisdiction, in the fundamental sense. Ordinarily, jurisdiction over a matter,

8

once attached, persists through final disposition. (2 Witkin, *supra*, Jurisdiction, § 415, p. 1065 ["once jurisdiction of the subject matter and of the person is obtained in a particular action, that jurisdiction continues throughout the action and in proceedings incident to it"]; see Code Civ. Proc., § 410.50, subd. (b) ["Jurisdiction of the court over the parties and the subject matter of an action continues throughout subsequent proceedings in the action."]; *Maloney v. Maloney* (1944) 67 Cal.App.2d 278, 280 ["Jurisdiction once acquired is not defeated by subsequent events which might have prevented jurisdiction had they occurred before personal service"]; *Goldman v. Simpson* (2008) 160 Cal.App.4th 255, 263-264 [applying rule to statutory renewal of judgment challenged on grounds of lack of personal jurisdiction].)

Defendant offers no cogent basis to suppose that his temporary absence from the state ousted the court of jurisdiction in the fundamental sense. The interpretation seemingly more in harmony with general procedural principles is that the court' powers were suspended and that, so long as it did not threaten to exercise them in an unlawful manner, and no unconstitutional delay resulted (see next part), no relief was warranted.

Defendant's authorities do not suggest otherwise. He cites cases holding that a state lacks jurisdiction to exercise its guardianship and conservatorship powers over persons outside its territory. (*Grinbaum v. Superior Court* (1923) 192 Cal. 566, 568 (*Grinbaum*); *McCormick v. Blaine* (1931) 345 Ill. 461, 464, 475 [178 N.E. 195, 196, 201] (*McCormick*); *Estate of Oelerich* (1961) 31 Ill.App.2d 457, 460 [176 N.E.2d 549, 550] (*Oelerich*); *Mack v. Mack* (Ct.App. 1993) 329 Md. 188, 198 [618 A.2d 744, 749] (*Mack*); *Guardianship of Enos* (App.Ct. 1996) 41 Mass.App.Ct. 360, 362-363 [670 N.E.2d 967, 968-969] (*Enos*).) A review of these cases reveals that none of them are more than loosely analogous to the present matter. In most of them, jurisdiction never attached, either over the subject matter or the person of the defendant. They typically concern an attempt to secure the appointment of a guardian or conservator for a person who has not been served with process in the forum state and who is not present either at the

9

commencement of the proceeding or at the time of any proposed order. (See *Grinbaum*, *supra*, 192 Cal. 566 [California forum; subject in Swiss sanitarium]; *Oelerich*, *supra*, 31 Ill.App.2d 457 [176 N.E.2d 549] [Illinois forum; subject in Indiana]; *McCormick*, *supra*, 345 Ill. 461 [178 N.E. 195] [Illinois forum; subject in California]; *Mack*, *supra*, 329 Md. 188 [618 A.2d 744] [Florida forum; subject in Maryland]; cf. *Enos*, *supra*, 41 Mass.App.Ct. 360, 362-363 [670 N.E.2d 967] [Massachusetts forum; ward under Florida guardianship removed without authorization to Massachusetts; jurisdiction declined on grounds of interstate comity, full faith and credit, and relative convenience of forums].)

Here the proceeding was commenced, and jurisdiction was acquired, while defendant was in the forum state.[2] Any apparent impairment of the court's power to adjudicate the matter only arose after that event. There was no attempt to make any order concerning his status, or adjudicate any issue going to the merits of the case, while that impairment existed. The cited cases are therefore inapposite.

Defendant does cite two cases that more nearly concern a loss of jurisdiction that had initially properly attached. This at any rate describes *Guardianship of Melissa W.* (2002) 96 Cal.App.4th 1293, 1299-1300, where a minor's emancipation by marriage was held to render moot an appeal from an order denying a petition by the minor's grandparents to be appointed as guardians. (See Fam. Code, §§ 7002, subd. (a)

---

[2] In his reply brief defendant asserts that the court "never properly assumed jurisdiction" because (1) defendant made no personal appearance before "the state relinquished [him] to Oregon authorities," and (2) the state "never showed he was properly served notice of the petition." It is far too late to assert this kind of objection. In his original motion to dismiss ("strike") the petition, he conceded that "the petition was properly filed" while he "was still in . . . California," that he "had the necessary minimum contacts with [California]," and that "he was provided with notice of the action, in that he has an attorney who has entered a general appearance and who has forwarded to him all the documents so far related to the case." These concessions effected a waiver several times over of any technical objections to service. (See Code Civ. Proc., § 410.50, subd. (a); *Fireman's Fund Ins. Co. v. Sparks Construction, Inc.* (2004) 114 Cal.App.4th 1135, 1145.)

10

[emancipation of minor by valid marriage]; Prob. Code, § 1600, subd. (b) [termination of guardianship upon emancipation]; *id.*, § 1515 [prohibiting appointment of guardian for child who has validly married]; *In re Katherine R.* (1970) 6 Cal.App.3d 354.) Defendant also cites *In re Marriage of Jensen* (2003) 114 Cal.App.4th 587, 594-595, which held that a family law court lacked jurisdiction to enforce provisions of a marital settlement agreement requiring one parent to facilitate visitation between the other parent and an autistic adult child. Defendant describes the case as holding that the court "lost jurisdiction when the child became an adult." So viewed it is substantially identical to *Melissa W.* However it may be more accurate to view it as a case in which the court never had jurisdiction to make a visitation order concerning an adult child in the first place. In any event, both cases are concerned with judicial powers that are conditioned by statute on the existence of a specified condition—that of being a minor in one case, or an unmarried minor in the other. In each case the termination or absence of that condition deprived the court permanently of the power to grant the requested relief. Here defendant's Oregon incarceration was temporary; he would be subject to return upon completion of his sentence. This, among other things, destroys any useful parallel between those cases and this one.

In sum, while we assume for present purposes that the court lacked the power to adjudicate the petition during defendant's incarceration in Oregon, we find no resulting defect in the proceedings below, where the court was not asked, and made no attempt, to exercise the powers thus suspended. Instead its temporary inability was suitably accommodated by awaiting the completion of defendant's Oregon term. Defendant has offered no persuasive basis for a different conclusion. Accordingly, he has failed to establish any jurisdictional deficiency arising from the petition's pendency while he was incarcerated in Oregon.

11

**III.** *Delay*

**A. Barker Test**

Defendant contends that the lapse of over three years between the filing of the petition and its being brought to trial was an excessive and unreasonable delay that violated his due process rights under the principles set forth in *Barker v. Wingo* (1972) 407 U.S. 514, 530 (*Barker*), as held applicable to SVP proceedings by this court in *People v. Litmon* (2008) 162 Cal.App.4th 383, 403-406.

Under *Barker* a speedy trial objection calls forth "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." (*Barker*, *supra*, 407 U.S. at p. 530, fn. omitted.)  The first factor to be considered is the length of the delay; "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors . . . ." (*Ibid*.)  No categorical measure can be applied; "the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." (*Id*. at pp. 530-531.)  Here it might be questioned whether the delay should be considered "presumptively prejudicial" since, as discussed in more detail below, it appeared to have little if any concrete effect on defendant. Assuming it was a substantial delay, however, it must be considered against the reason offered by the state to justify it. (*Id*. at p. 531, fn. omitted.)  An improper reason—such as hampering the defense—should weigh against the state; a neutral one, like overcrowded courts, should weigh less heavily against the state; and a good one, like a missing witness, "should serve to justify appropriate delay." (*Ibid*.)

Here the state's justification, which is foreshadowed by our discussion of defendant's jurisdictional challenge, seems compelling:  the matter could not proceed so long as defendant remained in Oregon custody.  Assuming Oregon authorities might have been persuaded to return defendant to California temporarily for a trial on the present petition, such a trial would seemingly have been futile or worse.  Assuming defendant were found to be a sexually violent predator at the time of trial, the court could not—so

long as he was to be returned to Oregon—make the order contemplated by the act, i.e., that he be "committed . . . to the custody of the State Department of Mental Health" (§ 6604) for an "indeterminate term" (*ibid*.) to "commence on the date upon which the court issues the initial order of commitment" (*id*., § 6604.1, subd. (a)). Assuming the court could properly make an order but hold it in abeyance pending defendant's return from Oregon, the finding on which the order rested could well become stale by that time. If made before November 8, 2006, the order would have expired two years after it was made, and quite possibly before defendant finished his Oregon term, presumably necessitating a renewal petition while he was still absent from this state. (See former §§ 6604, 6604.1, subd. (a).) Moreover, commitment as a sexually violent predator requires a finding of a "currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(3).) A significant lapse in time between the finding and the actual order of commitment is at best in tension with the intent of the act, if it does not offend it. Postponing the trial until nearer the time of actual anticipated commitment would conform much more nearly to that intent.

Defendant suggests that these difficulties should weigh against any finding of justification because California authorities "relinquish[ed]" custody to Oregon. The underlying assumption is that they had the option of refusing to do so. As a matter of naked power this may be true. Presumably Oregon would not launch a military strike to wrest defendant from California custody. But beyond this naked fact—or what we may safely assume to be a fact—the present record permits no determination as to the potential consequences of a refusal to surrender defendant to Oregon authorities. We will not lightly impugn official actions that appear intended, at worst, to serve the goal of interstate comity. Indeed, although the record is silent on this point, it is our general understanding that law enforcement and penal authorities of the several states routinely cooperate with one another under arrangements having varying degrees of formality.

13

Presumably all of these arrangements are ultimately found on undertakings, or at least expectations, of mutuality and reciprocity. Even if the authorities of one state might suffer no consequences in a single case from spurning the legitimate requests of their colleagues in another state, their doing so could easily jeopardize their own state's ability to perform its duties toward its citizens in other situations. We therefore decline to suppose, without a considerably more painstaking showing, that state officials acted unjustifiably in honoring another state's interests in circumstances like these, particularly where—as will appear—their doing so inflicted no appreciable harm on defendant

We conclude that, so far as this record indicates, defendant's absence from the state was a compelling justification for the delay in bringing his case to trial. Indeed, beyond the point just mentioned, defendant makes little effort to cast doubt on that conclusion. He scarcely acknowledges the *state's* reasons for failing to bring the case to trial, arguing instead what should be a point quite distinct from the speedy trial issue: that the *trial court* lacked a sound justification for *refusing his demand for a probable cause hearing*. He assumes that in doing so, the court adopted the petitioner's argument that only the state, not the defendant, is entitled to request such a hearing. Defendant then assails that argument as an insupportable reading of the SVP act. This argument does not appear to bear logically on the constitutional question of unreasonable delay, but raises instead a distinct statutory question: whether defendant had a right under the SVP act to demand a hearing, and whether the court erred by denying his demand on the ground, apparently, that he had no standing to make it. (See §§ 6601.5, 6602.) Perhaps because of defendant's failure to raise this point as a distinct claim of error, respondent has failed entirely to address it. Nor do we find it necessary to decide it, for even if the court erred by denying his request for a probable cause hearing, it would appear from the considerations we have already identified that the error was harmless.[3] The act explicitly

---

[3] We will comment on the issue to this extent: Contrary to the theme of defendant's argument, the Legislature may well have intended that only the state could

14

contemplates that a probable cause hearing can be "continued . . . upon a showing of good cause by the party requesting the continuance." (§ 6602, subd. (b).) The justifications we have already cited for the delay furnished good cause for continuing the probable cause hearing. Granting a request by defendant for a probable cause hearing would have been an empty gesture if, as seems nearly certain, the court would have simultaneously continued the hearing to a time when defendant was back in the custody of California authorities.

This brings us to the fourth factor under *Barker*, which is prejudice to the defendant.[4] The greater the prejudice, the more weighty the required justification. The *Barker* court recognized three common forms of arguable prejudice: "oppressive pretrial incarceration," unnecessary prolongation of "anxiety and concern of the accused," and "the possibility that the defense will be impaired." (*Barker*, *supra*, 407 U.S. at p. 532, fn. omitted.) Obviously, the "most serious" of these is "the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If

request that a probable cause hearing be scheduled. In the overall scheme of the act, the probable cause hearing may have been understood in part as a mechanism for ascertaining whether the defendant's *continued confinement* is justified after the expiration of whatever other power the state might have to detain him. In that view, once the defendant's *release* becomes imminent, the state will have to choose between requesting a probable cause hearing and permitting the release. To permit the defendant to request such a hearing whenever he chooses might jeopardize the orderly progress of the matter without affecting any substantial right or interest of the defendant's. Such considerations, however, would only become relevant, if at all, within the framework of a more rigorous inquiry into legislative intent—one starting, and perhaps ending, with the question whether the statute possesses any plain meaning on the question of who is entitled to request such a hearing.

[4] A third factor is whether the defendant asserted the right in the trial court; failure to do so will weigh against the objection, though it is not necessarily fatal. (*Barker, supra*, 407 U.S. at pp. 531-532, 528-529.) Here defendant raised the point by moving to dismiss for violation of his due process and speedy trial rights. Respondent does not challenge the sufficiency of this motion to avert any adverse inference on this point.

15

witnesses die or disappear during a delay, the prejudice is obvious.  There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.  Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." (*Ibid.*)

Defendant makes no real attempt to establish either that the delay caused him any markedly increased "anxiety and concern" or that it impaired his defense.  As a general matter one would expect both of these forms of prejudice to be somewhat less in SVP cases than in criminal cases.  The defendant is not exposed to the risk of *punishment* as such, but to confinement in an environment where the state undertakes to provide treatment.  And the "dimming memories and loss of exculpatory evidence" which might impair a defense seem a generally more remote possibility in SVP cases than in criminal prosecutions.  The central inquiry in the latter is historical, i.e., what actually happened on some past occasion.  Evidence bearing on such a question is obviously prone to fade or disappear as the event recedes into the ever-more-distant past.  But the chief inquiry in a typical SVP case is the defendant's *current* mental condition.  (See § 6600, subd. (a)(3).)  To be sure, there may be cause to inquire into past events, but much of that evidence will be matters of public record, such as the defendant's criminal record.  For these reasons, the passage of time is likely to inflict less of the kind of evidentiary harm that can occur in a criminal case.  Defendant offers no reason to suppose that this case marks a departure from the expected norm in this regard.

This leaves us with the question whether defendant suffered such " ' "oppressive pretrial incarceration" ' " as to render the delay unconstitutional.  (*Litmon*, *supra*, 162 Cal.App.4th at p. 406, quoting *Barker*, *supra*, 407 U.S. at p. 532.)  We find that he did not.  For most of the time in question he was incarcerated for reasons wholly unrelated to the present petition.  In *Litmon*, *supra*, 162 Cal.App.4th 383, our finding of a violation of due process rested heavily on the fact that the defendant's prolonged confinement there constituted a denial of " 'the most elemental of liberty interest,' " *solely on the basis of an*

16

*unadjudicated SVP petition.* (*Id.* at p. 399, quoting *Hamdi v. Rumsfeld* (2004) 542 U.S. 507, 529; see *id.* at p. 404 [even if initial delay was justifiable, further postponement could not be reconciled with due process principles "given appellant's complete loss of liberty awaiting trial"].) Here, in contrast, defendant was in the custody of another sovereign, and under its control, through most of the challenged period. He suffered no confinement as a result of the SVP petition until he was returned to the custody of California authorities. We do not understand him to contend that the lapse of time between that event and trial constituted an unreasonable delay. His pretrial incarceration was not a prejudicial *incident* of the delay, but rather a *cause* of it. That incarceration cannot be attributed to the present proceeding so as to support a claim of unconstitutional delay. This fact distinguishes the cases cited by defendant concerning the inherently prejudicial quality of prolonged detention; the defendants in those cases were prevented by the challenged proceedings from being free citizens, walking the streets. Here defendant would not have been walking the streets even if the present petition had been dismissed.

Defendant claims prejudice in two other respects: One is that because of the delay, he became subject to an indefinite commitment rather than a two-year renewable commitment. We have previously rejected a similar claim of prejudice. (*Litmon*, *supra*, 162 Cal.App.4th at p. 405.) The other is that the delay constituted a denial of treatment and interruption of rehabilitative services to which he would have been entitled, under the act, upon entry of an order of commitment. It is true that the sooner he was committed, the sooner he would have been entitled to receive "programming" that would "afford . . . treatment for his . . . diagnosed mental disorder." (§ 6606, subd. (a).) There is no showing, however, that he was not offered comparable treatment in Oregon or that he would have availed himself of treatment if it were offered. Moreover the case he cites on this point concerned a defendant who had been confined for 17 months on the ground that he was *not competent to stand trial.* (*Craft v. Superior Court* (2006) 140 Cal.App.4th

17

1533.) The failure to provide treatment in that context inflicted a unique form of prejudice in that *it would prevent the defendant from ever going to trial*, and thus ever regaining his freedom, unless his disabling mental condition somehow spontaneously remitted. The court reasoned that in the absence of treatment, the justification for the pretrial confinement failed. (See *id*. at p. 1545 ["where there is no commitment and no treatment, the time an incompetent defendant spends in jail is unnecessary and implicates not only due process, but also counts towards a finding of prolonged incarceration under the state constitutional speedy trial guarantee"].) This reasoning is unimpeachable in its context, but has little if any force here.

We detect no violation of defendant's due process rights as articulated in *Barker*.

## B. *Mathews Test*

Defendant also asserts that his due process rights were violated under the principles of *Mathews v. Eldridge* (1976) 424 U.S. 319, on which this court relied in *Litmon*, *supra*, 162 Cal.App.4th at page 396. Those cases, however, address the due process concerns peculiarly attendant upon a preliminary invasion of a citizen's substantive constitutional interest in liberty or property. In *Mathews*, the question was "what process is due prior to [an] initial termination of [social security] benefits, pending review." (*Mathews v. Eldridge*, *supra*, 424 U.S. at p. 333.) In *Litmon* we were concerned with the parallel question in the present context—what process is due an alleged SVP when he is *confined pending trial*. As pertinent here, the teaching of those cases is that delay in adjudicating the subject's rights may require a heightened level of procedural protection in connection with a *preliminary infringement* of the claimed rights.

As discussed above, for most of the period in question the pending SVP petition was not the source of any infringement of defendant's liberty interests. Rather his liberty was being lawfully curtailed by the state of Oregon. This distinguishes, and seems to render largely irrelevant, the rule of *Mathews* as applied to the SVP setting in *Litmon*.

18

No denial of due process appears.

**IV.** *Underground Regulation*

Defendant contends that the court below lacked jurisdiction to make a commitment order because the guidelines under which he was evaluated pursuant to statute were an invalid "underground regulation." We hold that the invalidity of the regulation did not deprive the court of jurisdiction.

The SVP act provides that before any petition for commitment can be filed, the Department of Mental Health (DMH) must secure an evaluation of the subject by "two practicing psychiatrists or psychologists" (§ 6601, subd. (d)), such evaluation to be made "in accordance with a standardized assessment protocol, developed and updated by the State Department of Mental Health, to determine whether the person is a sexually violent predator" (id., subd. (c)). In late 2004, apparently, defendant was evaluated pursuant to this statute. The evaluations were presumably conducted pursuant to the then-prevailing departmental protocol as embodied in a published handbook. In 2008, the Office of Administrative Law (OAL) ruled that portions of the handbook and protocol were "regulations" as defined in Government Code Section 11342.600 and, as such, should have been adopted in accordance with the chapter of the Government Code commonly known as the Administrative Procedures Act (Gov. Code, §§ 1149 et seq, (APA)). (2008 OAL Determination No. 19 (Aug. 15, 2008) <http://www.oal.ca.gov/res/docs/pdf/ determinations/2008/2008_OAL_Determination_19.pdf> (as of Apr. 3, 2013) (OAL Determination).) Government Code section 11340.5, subdivision (a), declares that "[n]o state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in Section 11342.600, unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State pursuant to this chapter." As the OAL wrote, "When an agency issues, utilizes, enforces, or attempts to enforce a rule in

19

violation of section 11340.5 it creates an underground regulation as defined in title 1, California Code of Regulations, section 250." (OAL Determination, p. 5.)

Similar objections have been rejected in a number of cases, mostly unpublished, on procedural grounds—most notably, that the defendant forfeited the objection by failing to assert it in the trial court. (See *People v. Medina* (2009) 171 Cal.App.4th 805, 818 & *People v. Taylor* (2009) 174 Cal.App.4th 920, 937-938.) Those holdings are arguably distinguishable in that they rested on multiple grounds, including some arising from the fact that in each of them, the allegedly defective evaluation was conducted not in anticipation of the petition giving rise to the judgment under review but rather in connection with an earlier petition. Moreover if the question really went to the trial court's subject matter jurisdiction it could be raised at any time.

Nonetheless we reject defendant's argument on the merits because we find it incompatible with principles of administrative law. Assuming the protocol was indeed a procedurally invalid regulation, as the OAL concluded, that fact alone does not invalidate an evaluation conducted in accordance with it, let alone a trial court order that is derived from that evaluation only in the sense that the evaluation furnished a procedural precondition for the petition the court ultimately adjudicated. Had defendant challenged the evaluation prior to trial, his challenge would have been well taken. But in the absence of a demonstration of prejudice, the claimed defect cannot invalidate the judgment after trial.

We accept for present purposes that the assessment protocol under which defendant was evaluated did constitute an underground regulation and thus offended the APA. (See *In re Ronje* (2009) 179 Cal.App.4th 509, 516.) This did not deprive the court of jurisdiction, however, and does not render the judgment void. (*Id.* at p. 518; see *Davenport v. Superior Court* (2012) 202 Cal.App.4th 665, 670 ["The use of an administratively invalid assessment protocol . . . does not affect the superior court's fundamental jurisdiction over an SVP proceeding."].) An underground regulation "is

20

invalid" (*Naturist Action Committee v. California State Dept. of Parks & Recreation* (2009) 175 Cal.App.4th 1244, 1250), but it does not follow that any agency action predicated on such a regulation—let alone court action predicated on the agency's application of it—is void ab initio. In *Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324 (*Morning Star*), the court held that an agency's construction of a statute in a manner that imposed a hazardous materials fee on virtually all enterprises of a certain size was an underground regulation and, as such, invalid. But the court did not hold that all actions taken under the regulation were void. Instead the court remanded the matter for further administrative proceedings "without reliance upon the Department's invalid regulation." (*Id*. at p. 341.) The superior court was directed to stay the associated judicial proceedings and make such other orders as might be necessary to preserve the status quo "until such time as the Department has had a reasonable opportunity to promulgate valid regulations under the APA." (*Ibid*.) Once it had done so, the court ruled, "these proceedings" and the agency's collections generally would be "governed by any properly adopted regulations." (*Id*. at p. 342.) The court found precedent for such an approach in an earlier decision where it held a wage order defective but exercised its " 'inherent power to make an order appropriate to preserve the status quo pending correction of deficiencies.' " (*Ibid*., quoting *California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 216.)

In both of these cases the court cited the importance of the public interest served by the challenged regulation, as reflected in the underlying statute and the potential effect of disrupting its execution. (*Morning Star*, *supra*, 38 Cal.4th at p. 342; *California Hotel & Motel Assn. v. Industrial Welfare Com.*, *supra*, 25 Cal.3d at p. 216.) It can hardly be suggested that this consideration is lacking in the matter at hand. Indeed, the case for invalidating the present judgment on this basis is even weaker than the parallel arguments were in those cases. Here the regulation did not furnish the governing rule of decision for the adjudication of defendant's interests but only the methodology for reaching a

21

preliminary determination of his suitability for treatment as a sexually violent predator. That preliminary determination, while necessary to the judgment as a matter of procedural history, had no substantive bearing on the final adjudication of the matter. Instead the question was tried de novo before a jury.

In *In re Ronje*, *supra*, 179 Cal.App.4th 509, 518, the court rejected the defendant's claim that reliance on the invalid protocol gave rise to a defect in fundamental jurisdiction, requiring dismissal. It cited precedent holding that even a failure to secure the required evaluation before filing the petition did not oust the court of jurisdiction because the requirement was a "collateral procedural condition" such that noncompliance would be " 'ignored' " if cured by the time the objection was raised. (*Id*. at p. 519, quoting *People v. Superior Court (Preciado)* (2001) 87 Cal.App.4th 1122, 1127-1128; see *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 894, 905.) Thus if the objection is raised before trial—as it was in that case—the trial court may "cure the underlying error" (*id*. at p. 518) by ordering new evaluations under a properly adopted protocol and conducting a new probable cause hearing (*id*. at pp. 519, 521). Here, where the objection was raised too late for any pretrial cure, we conclude that the defect was "cured" when the procedurally defective evaluation was superseded by the jury's verdict. In the absence of some particularized showing of prejudice—which defendant does not attempt to make—the defect furnishes no basis for reversal. While this analysis resembles a finding of forfeiture in some respects, it is not. It rests on the premise that given the nature of the defect, and its supersession by the later verdict, it does not constitute cognizable error.

## V. *Indeterminate Commitment*

Defendant contends that his commitment for an indeterminate period under the 2006 amendments to the SVP act effected by Proposition 83 violates due process and equal protection as well as the ex post facto and double jeopardy clauses of the state and federal constitutions. With one exception, all of these objections were addressed and

22

rejected by the California Supreme Court in *McKee*, *supra*, 47 Cal.4th 1172. The court found itself unable to rule, however, on an equal protection challenge premised on the contention that no adequate justification existed for treating SVP's differently from others who were involuntarily confined on account of a dangerous mental condition—in particular, those confined after prevailing on a plea of not guilty by reason of insanity (NGI's), and those confined under the Mentally Disordered Offender Act (MDO's). (Pen. Code, § 2960 et al.) The Supreme Court concluded that SVP's and MDO's are similarly situated for purposes of equal protection analysis, such that committing the former to an indeterminate confinement while requiring the latter's confinement to be periodically justified beyond a reasonable doubt "raises a substantial equal protection question that calls for some justification by the People." (*Id*. at p. 1203.) The record there was insufficient to determine whether such a justification existed. But because neither the state nor the courts had "properly understood [the] burden" the state was required to meet (*id*. at pp. 1207-1208), the court found it appropriate to provide the state an opportunity "to make the appropriate showing" (*id*. at p. 1208). It therefore reversed the order of commitment in part and remanded with directions for further trial court proceedings addressed to "whether the People . . . can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*Id*. at pp. 1208-1209, fn omitted.)

Our original decision here emulated the Supreme Court's order and remanded the matter "for the limited purpose, as stated in *McKee, supra*, 47 Cal.4th 1172, of allowing the People to demonstrate 'the constitutional jurstification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment.' (*Id*. 1208.)" (*People v. Gomberg* (Jun. 30, 2010, H033519) [nonpub. opn.] review granted Oct. 20, 2010, S185107.)The Supreme Court, however, granted review and retransferred the matter to us with directions to vacate our decision "and, in order to avoid an unnecessary multiplicity of proceedings, to suspend further proceedings

23

pending finality of the proceedings on remand in *McKee, supra,* 47 Cal.4th 1172 (see *id.* at pp. 1208-1210), including any proceedings in San Diego County Superior Court in which *McKee* may be consolidated with any related matters." (Supreme Ct. Mins., Oct. 20, 2010, S185107, see <http://www.courts.ca.gov/documents/minutes/ SOCT2010.PDF> (as of Mar. 20, 2013).) The court further explained that by " '[f]inality of the proceedings,' " it intended to "include the finality of any subsequent appeal and any proceedings in this court." (*Ibid.*)

The trial court in *McKee* thereafter conducted an evidentiary hearing, at the conclusion of which it ruled that that the state had demonstrated a constitutionally sufficient justification for treating SVP's differently from MDO's and NGI's. The resulting order was affirmed by the Fourth District, and the Supreme Court denied review. (*People v. McKee* (2012) 207 Cal.App.4th 1325, review den. Oct. 10, 2012 , No. S204503.)

Following these events we invited the parties here to submit supplemental briefs on the constitutional issues in light of the subsequent proceedings in *McKee*. Defendant argues that we should not follow the Fourth District's analysis in that matter because the court failed to properly apply the law governing equal protection challenges subject, as this one is, to a standard of strict scrutiny. Respondent contends that we are bound by the Fourth District's holding "unless and until a higher court directs otherwise." While the case presents some novel issues of appellate procedure, and particularly stare decisis, we have concluded that we are not at liberty to depart from the Fourth District's holding.

Ordinarily the opinion of one Court of Appeal is not binding on another Court of Appeal. (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 498, p. 558.) "However, there is a tendency for a Court of Appeal to follow decisions from the same or other districts or divisions." (9 Witkin, *supra*, Appeal, § 498, p. 560; see § 499, p. 560.) Here the Supreme Court itself strongly implied that the determination on remand in *McKee* should, once final, be given considerable, if not conclusive, weight. The court directed us

24

to abate this matter, "in order to avoid an unnecessary multiplicity of proceedings . . . pending finality of the proceedings on remand" in *McKee*. And the court made clear that it intended such suspension of proceedings to continue until the trial court's decision had been reviewed by the Fourth District, and that court's opinion in turn had become final after "any proceedings in this [i.e., the Supreme] court." This directive seemed to contemplate that the lower courts in the *McKee* matter would render a decision which, if not taken up by the Supreme Court for review, would itself decide on a statewide basis the issues addressed by them. We are aware of no precedent for such a procedure; but then, we are aware of no precedent for the high court's order staying proceedings in this matter (and several others like it) pending the outcome of an independent proceeding in another district. If we have misconstrued the Supreme Court's intent, the remedy would seem to lie in that court's again granting review in this matter and providing further direction on how we are to proceed.

This view seems logically consistent with the approach taken by both parties in their supplemental briefs here. Both seem to assume that the evidence presented to the trial court in *McKee* is determinative of the equal protection issue; they differ only over the evaluation of that evidence. But if we declined to adhere to the Fourth District's analysis, the evidence in that case would furnish no basis, under ordinary procedural principles, for a disposition here. This court does not review proceedings of the San Diego Superior Court and has no power to reverse or modify its judgments and findings, or even to order the transmission of its records for our examination. If we elected not to follow the Fourth District's opinion, the correct disposition would seem to be a remand for further proceedings in the trial court here, parallel to those conducted by the trial court in *McKee*. Neither party has proposed such a disposition. Defendant essentially asks us to review the Fourth District's opinion and reached the opposite result based solely upon the facts as stated there. But again, such an approach is without precedent. We have no power to review opinions of a coequal Court of Appeal, and no known procedural

25

principle permits us to base a judgment of this court on the facts, as distinguished from the holding, in an opinion by another co-equal court.

Finally, we observe that under the peculiar circumstances of this case, the Supreme Court's denial of review in *McKee* must be construed, in the absence of any indication to the contrary, as an endorsement of that decision. The court itself has said that when it denies a petition for review, that ruling is not "without significance." (*DiGenova v. State Board of Education* (1962) 57 Cal.2d 167, 178.) Here the significance is magnified by the court's directive to this court, and other courts entertaining similar challenges, to suspend proceedings until after "any proceedings in this court" in *McKee*. When the court itself has acknowledged the statewide significance of a case by explicitly making its disposition a predicate for further proceedings in other matters around the state, we can hardly suppose that the court would deny review in that case if it doubted the correctness of its determination of the issues it had in common with those other cases.

We conclude that the California Supreme Court has in effect directed us to abide by the Fourth District's decision in *McKee*. In accordance with that implied directive, we are constrained to reject defendant's constitutional challenges to the SVP act.

## DISPOSITION

The order appealed from is affirmed.

_____
RUSHING, P.J.

WE CONCUR:


_____
PREMO, J.



_____
ELIA, J.